**SUPREME COURT OF THE STATE OF NEW YORK**
**COUNTY OF NEW YORK**

| | |
|---|---|
| MOONA CHOUDHRY and KAMAL HARRY, on behalf of themselves and all others similarly situated,<br><br>　　　　　　　　　Plaintiffs,<br><br>　- against -<br><br>MEAD JOHNSON & COMPANY, LLC,<br><br>　　　　　　　　　Defendant. | CASE NO.<br><br>**CLASS ACTION COMPLAINT**<br><br>1.　Violation of the New York General Business Law § 349<br>2.　Violation of the New York General Business Law § 350<br>3.　Fraud by Misrepresentation<br>4.　Negligent Misrepresentation<br>5.　Unjust Enrichment<br>6.　Breach of Implied Warranty<br><br>**DEMAND FOR JURY TRIAL** |

<u>**CLASS ACTION COMPLAINT**</u>

1.　　　Plaintiffs Moona Choudhry and Kamal Harry ("Plaintiffs"), individually and on behalf of all others similarly situated, through their undersigned attorneys, brings this Class Action Complaint against Defendant Mead Johnson & Company, LLC ("Defendant" or "Mead"), for its knowing, reckless, negligent, and/or intentional practice of misrepresentations and partial misrepresentations that its infant formulas ("Products" or "Infant Formulas") were of high quality and nutritious when, in fact, they contained or had a material risk of containing Heavy Metals and its failure to disclose same on its packaging of the Products.[1] The Infant Formulas are sold in New

---

[1] As used herein, "Heavy Metals" includes arsenic, cadmium, and lead, or any compounds thereof, whether organic or inorganic in origin. "Products" or "Infant Formula(s)" as to the Heavy Metals allegations refer to the following Mead powdered infant formula products: Enfamil A.R., Enfamil Gentlease, Enfamil Enspire/Optimum Gentlease, Enfamil NeuroPro, Enfamil NeuroPro Sensitive, Enfamil Nutramigen, Enfamil ProSobee, and PurAmino Hypoallergenic. Discovery may reveal additional products that contain Heavy Metals and/or the presence of additional heavy metals. Plaintiffs reserve their right to amend and include any such additional products or heavy metals in this action.

Case 1:25-cv-09480    Document 1-1    Filed 11/13/25    Page 2 of 67

York and throughout the United States and do not conform to their packaging. Plaintiffs seek both injunctive and monetary relief on behalf of the proposed Classes (as defined herein), including requiring full disclosure of the risk or presence of Heavy Metals on the Products' packaging, and restoring monies to the members of the proposed Classes. Plaintiffs allege the following based upon personal knowledge as well as investigation by their counsel as to themselves, and as to all other matters, upon information and belief. Plaintiffs believe that substantial evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## NATURE OF THE ACTION

2.      Mead is one of the primary manufacturers of infant formula in the United States and previously held 39.6% of the market share for powdered infant formula.[2] As a trusted manufacturer and vendor of products consumed exclusively by babies and young children, it carries a duty of the highest importance to implement and maintain quality control when manufacturing its products. A company that sells essential products, such as Defendant who sells infant formula, must not knowingly fail to ensure the safety of its products or allow dangerous toxins or contaminants, such as Heavy Metals, to be consumed by unsuspecting consumers. Rather, these companies have a duty to represent the true quality and nutritiousness of the Products, including material risks of contamination—allowing consumers to make informed decisions about the risks they are willing to take (especially with the health of their infants) and assess the value of the product they are considering for purchase. Defendant failed to do so.

3.      Defendant's Products contain dangerous toxins: Heavy Metals. As detailed below, individuals, especially infants, who consume Heavy Metals risk developing serious adverse health

---

[2] *Market Share of the Leading Vendors of Baby Formula (Powder) in the United States in 2016, Based on Dollar Sales*, available at https://www.statista.com/statistics/443975/market-share-of-the-leading-us-baby-formula-powder-companies/ (last accessed September 24, 2025).

2

Case 1:25-cv-09480    Document 1-1    Filed 11/13/25    Page 3 of 67

effects – a risk which most consumers strongly prefer to avoid in food they feed children (who are more vulnerable to those risks than others). Yet, Defendant presented itself to parents as a company they could trust, when it was misrepresenting and partially misrepresenting to parents purchasing infant formula material information about the Products' quality and nutritiousness and that the Products contained or had a risk of containing Heavy Metals.

4.      Infants rely on breastmilk and/or infant formula for their nutrition and growth. The U.S. Dietary Guidelines for Americans and the American Academy of Pediatrics ("AAP") recommend breastfeeding babies exclusively for about six months from birth and continuing afterwards along with introduction of solid foods until they are 12 months old and beyond.[3] However, according to the Centers for Disease Control and Prevention ("CDC"), as of 2022, only 47.6% of babies under three months old are exclusively breastfed, and the percentage of babies exclusively breastfed through six months dropped to 27.9%.[4] Breastmilk and infant formula continue to be the primary source of nutrition for children up to 12 months.[5]

5.      Reasonable parents, like Plaintiffs, trust and depend on manufacturers, like Defendant, to sell infant formula that is of high quality, nutritious, and free from the presence or material risk of harmful toxins, contaminants, and chemicals like Heavy Metals, substances known to have significant and unsafe developmental and health consequences as detailed herein.

---

[3]  *See* CDC, *Infant and Toddler Nutrition: Recommendation and Benefits*, available at https://www.cdc.gov/infant-toddler-nutrition/breastfeeding/?CDC_AAref_Val= https://www.cdc.gov/nutrition/infantandtoddlernutrition/breastfeeding/recommendations-benefits.html (last accessed September 24, 2025).

[4]  *See* CDC, *Breastfeeding Data; NIS-Child Data Results* (Aug. 21, 2025), https://www.cdc.gov/breastfeeding-data/survey/results.html (last accessed September 24, 2025).

[5] *See* CDC, *Infant and Toddler Nutrition: How Much and How Often to Feed* (March, 11, 2025), https://www.cdc.gov/infant-toddler-nutrition/foods-and-drinks/how-much-and-how-often-to-feed.html (last accessed September 24, 2025).

Case 1:25-cv-09480     Document 1-1     Filed 11/13/25     Page 4 of 67

6.      Consumers lack the knowledge and opportunity to determine whether Defendant's

Products do in fact contain (or have a risk of containing) Heavy Metals or to ascertain the true

nature of the ingredients and quality of the Products. Reasonable consumers therefore must and do

rely on Defendant to represent properly and fully what its Products contain. The importance of

Defendant's misrepresentations, partial misrepresentations and omissions is critical with respect

to the risk or presence of Heavy Metals that are being fed to hours-, days-, or months-old babies.

Such information would be material to any reasonable parent's purchasing decisions.

7.      Defendant's packaging is designed to induce reasonable consumers to believe in

the high quality and nutritiousness of its Infant Formulas. But Defendant misrepresents and

partially misrepresents the quality and nutritiousness of the Products in order to deceptively hide

the presence (or risk) of Heavy Metals in the Products, which is nowhere disclosed on the

packaging.

8.      For example, the packaging emphasizes that the Infant Formulas are healthy and

made with nutritious ingredients that help support proper development and growth and are the #1

Recommended Brand by Pediatricians:

4







9.      Based on the material misrepresentations, partial misrepresentations, and omissions communicated by the packaging, no reasonable consumer could expect or understand that the Infant Formulas contained or had a material risk of containing Heavy Metals. This is especially

true as the development and physical risks created by ingestion of Heavy Metals by infants are well-recognized and contradict the high quality and nutritiousness statements made by Defendant.

10.     Defendant's website provides further context to demonstrate that the Products' packaging is deceptive by promising a healthy product that poses no risks to any infants. Specifically, Defendant promises on its website that: (1) Defendant "[s]upport[s] the brain in everything" it does with products that "are excellent for routine, everyday feeding;"[6] (2) "[t]he health and safety of infants and children is [Defendant's] top priority," and it is "committed to providing a high quality and safe products [sic] for [its] littlest consumers;"[7] (3) Defendant's "products undergo extensive quality and safety checks throughout the manufacturing process—from raw materials to finished product" and "samples from every batch [it] produce[s] are tested to ensure the product meets [its] stringent quality standards;"[8] and (4) "[p]arents can be assured that our infant formulas are safe and nutritious feeding options for their infants."[9] These representations are each in direct contradiction to the risk or presence of Heavy Metals in the Products.

11.     On information and belief, Defendant was knowingly, recklessly, negligently, and/or intentionally selling Infant Formulas that contained or risked containing detectable levels of arsenic, cadmium, and/or lead but instead misrepresented and partially misrepresented the high quality and nutritiousness of the Products and failed to disclose that the Products contained or risk containing Heavy Metals.

---

[6] https://www.enfamil.com/why-enfamil/enfamil-formula-family/ (last accessed September 24, 2025).

[7] https://www.enfamil.com/why-enfamil/quality-assurance/ (last accessed September 24, 2025).

[8] *Id.*

[9] *Id.*

12.     Independent testing has confirmed the presence of Heavy Metals in two of Defendant's infant formulas:[10]

| Infant Formula | Arsenic (ppb) | Cadmium (ppb) | Lead (ppb) |
|---|---|---|---|
| Enfamil ProSobee | 6.2* | 6.9 | 7.8 |
| Enfamil Infant – Infant Formula Milk-Based with Iron, 0-12 months | < 2.2 | 0.7* | 2.0 |

13.     Additional recent independent testing also confirmed the presence of Heavy Metals in Defendant's Enfamil Nutramigen and PurAmino Hypoallergenic.[11]

14.     Arsenic, cadmium, and lead are all known to pose health risks to humans, and particularly to infants.[12]

15.     There are no safe levels of any Heavy Metal.[13] Exposure to Heavy Metals has significant and dangerous health consequences. A 2021 report by a U.S. House of Representatives' Subcommittee highlighted the material risk of the presence of Heavy Metals in infant formula and

---

[10] Healthy Babies Bright Futures Report: *What's in My Baby's Food?*, at 20, available at https://www.healthybabyfood.org/sites/healthybabyfoods.org/files/2020-04/BabyFoodReport_ENGLISH_R6.pdf (last accessed September 24, 2025) ("HBBF Report").

[11] Lauren Kirchner, *We Tested 41 Baby Formulas for Lead and Arsenic*, CONSUMER REPORTS (March 18, 2025; updated March 21, 2025), https://www.consumerreports.org/babies-kids/baby-formula/baby-formula-contaminants-test-results-a7140095293/ (last accessed September 24, 2025) ("We Tested 41 Baby Formulas for Lead and Arsenic").

[12] *See generally*, HBBF Report, *supra*, n.10.

[13] *FDA Webinar: Action Levels for Lead in Food Intended for Babies and Young Children: Draft Guidance*, at 5 (March 2, 2023), https://www.fda.gov/media/166188/download (last accessed September 24, 2025) ("Although we may not be able to say the reference level is a safe level, it is a level we could rely on as a benchmark to measure exposure to foods."); *see also* Kevin Loria, *Congressional Report Finds More Problems With Heavy Metals in Baby Food*, CONSUMER REPORTS (Sept. 29, 2021, updated Oct. 20, 2021), https://www.consumerreports.org/health/food-safety/problems-with-heavy-metals-in-baby-food-congressional-report-a6400080224/ (last accessed September 24, 2025).

7

baby food, spurred by the knowledge that "[e]ven low levels of exposure can cause serious and often irreversible damage to brain development."[14]

16.     Despite the known health risks, Defendant knowingly, recklessly, negligently, and/or intentionally chose to misrepresent and partially misrepresent the true quality and nutritiousness of the Infant Formulas when, in fact, the Products contained or risked containing Heavy Metals, which was nowhere disclosed on the packaging.

17.     The Infant Formulas' packaging does not include any type of disclaimer or disclosure regarding the presence of Heavy Metals that would inform consumers of their presence or risk. Likewise, nothing on the packaging states that ingestion of Heavy Metals can be unsafe or accumulate over time resulting in developmental issues, poisoning, injury, and/or disease.

18.     Instead, to induce reasonable consumers to believe in the quality and nutritiousness of its Products and to justify a price that reflects a premium, Defendant chose to focus on promoting the Infant Formulas on its packaging as high quality and made with nutritious ingredients.

19.     Defendant's marketing strategy reflects the concerns raised by the World Health Organization ("WHO") and UNICEF in their report acknowledging the troubling marketing efforts by infant formula manufacturers.[15] This report raises deep concerns over the lasting and pervasive

---

[14] U.S. House of Representatives, Committee on Oversight and Reform, Subcommittee on Economic and Consumer Policy, Staff Report, "Baby Foods Are Tainted with Dangerous Levels of Arsenic, Lead, Cadmium, and Mercury," February 4, 2021, available at https://oversightdemocrats.house.gov/sites/evo-subsites/democrats-oversight.house.gov/files/2021-02-04%20ECP%20Baby%20Food%20Staff%20Report.pdf (last accessed September 24, 2025) ("Congressional Committee Report"); *see also* U.S. House of Representatives, Committee on Oversight and Reform, Subcommittee on Economic and Consumer Policy, Staff Report, "New Disclosures Show Dangerous Levels of Toxic Heavy Metals in Even More Baby Foods," September 29, 2021, available at https://oversightdemocrats.house.gov/sites/evo-subsites/democrats-oversight.house.gov/files/ECP%20Second%20Baby%20Food%20Report%209.29.21%20FINAL.pdf (last accessed September 24, 2025) ("Second Congressional Committee Report").

[15] WHO, *How the Marketing of Formula Milk Influences our Decisions on Infant Feeding*,

negative effects from the false and misleading information received by parents, including Plaintiffs and the Class members, through aggressive marketing efforts by infant formula manufacturers such as Defendant.[16]

20.     Based on Defendant's packaging, no reasonable consumer had any reason to know or expect that the Infant Formulas contained Heavy Metals. Furthermore, reasonable parents, like Plaintiffs and the Class members, who were feeding the Infant Formulas to their babies (multiple times a day) would consider quality and nutritiousness and the mere presence (or risk) of Heavy Metals material when considering purchasing the Infant Formulas.

21.     Defendant knows its customers trust the quality of its Products that are manufactured for the most vulnerable population – infants – and expect the Infant Formulas to be properly and safely manufactured and free from the risk and actual presence of Heavy Metals. Defendant also knows its customers seek out and wish to purchase infant formulas that possess nutritious ingredients free of toxins, contaminants, or chemicals, and that these consumers will pay for infant formulas they believe possess these qualities. Defendant also knows no reasonable consumer would knowingly provide his or her child with infant formula containing Heavy Metals.

22.     Defendant knew parents would find the misrepresentations, partial misrepresentations and omissions material when deciding whether to purchase the Infant Formulas and that it was in a special position of public trust to those consumers.

_____

February 22, 2022, available at https://iris.who.int/bitstream/handle/10665/352098/9789240044609-eng.pdf (last accessed September 24, 2025).

[16] National Public Radio, *Infant Formula Promoted in 'Aggressive' and 'Misleading' Ways, Says New Global Report*, March 1, 2022, available at https://www.npr.org/sections/goatsandsoda/2022/03/01/1082775961/infant-formula-promoted-in-aggressive-and-misleading-ways-says-new-global-report (last accessed September 24, 2025).

Case 1:25-cv-09480    Document 1-1    Filed 11/13/25    Page 10 of 67

23.     Defendant also knew consumers believed the Infant Formulas were a premium product based on the misrepresentations, partial misrepresentations and omissions.

24.     The misrepresentations, partial misrepresentations and omissions are deceptive, misleading, unfair, and/or false because the Infant Formulas were manufactured in such a way that they contained (or risked containing) undisclosed Heavy Metals.

25.     The material misrepresentations, partial misrepresentations and omissions allowed Defendant to capitalize on, and reap enormous profits from, reasonable consumers who paid a premium price for Infant Formulas that did not disclose the Products' true quality and nutritiousness, and, in turn, the true value of the Products. Defendant continues to wrongfully induce consumers to purchase the Infant Formulas while promoting the Products' high quality and nutritious ingredients that, in fact, contain or risk containing Heavy Metals.

26.     Plaintiffs bring this proposed consumer class action individually and on behalf of all other members of the Classes (as defined herein), who, from the applicable limitations period up to and including the present, purchased for household use and not resale any of Defendant's Infant Formulas.

**JURISDICTION AND VENUE**

27.     This Court has personal jurisdiction over Defendant pursuant to NY CPLR §§ 301 & 302 because Defendant conducts substantial business in this State, including the sale of the Infant Formulas throughout New York County. Defendant transacts business through the sale of the Infant Formulas to third parties including grocery stores, pharmacies, convenience stores, drug stores, and other similar markets where Plaintiffs and the Classes in turn purchased the Infant Formulas.

Case 1:25-cv-09480    Document 1-1    Filed 11/13/25    Page 11 of 67

28.    This Court is the proper venue for this action because many of the acts and omissions giving rise to Plaintiffs' and the Classes' claims occurred in New York County, Plaintiff Moona Choudhry at all relevant times resided and purchased the Products in New York County, and the purchases giving rise to that Plaintiff's claims occurred in New York County.

29.    Defendant has committed tortious acts outside this State by its omissions and labeling the Products in a manner which causes injury to consumers within this State by misleading them as to its contents, ingredients, production practices, and/or quality, through causing the Products to be distributed throughout this State, such that it expects or should reasonably expect such acts to have consequences in this State and derives substantial revenue from interstate or international commerce.

30.    Venue is proper in the Commercial Part of this Court pursuant to 22 NYCRR § 202.70(a) & (b)(1) insofar as this lawsuit is a class action alleging misrepresentation and fraud by omission, and the damages sought for the Classes, exclusive of punitive damages, interests, costs, disbursements, and counsel fees claim, exceed $500,000.

## **THE PARTIES**

31.    Plaintiff Moona Choudhry is an individual and consumer, not a reseller or merchant. At all times relevant to her claims, she has been a resident of New York County in the State of New York. She purchased the Infant Formulas, including Enfamil® Nutramigen, for household use.

32.    Plaintiff Choudhry purchased the Infant Formulas for her child from CVS stores in New York, New York between January and March 2025.

33.    Plaintiff Choudhry believed she was feeding her child high quality and nutritious Infant Formula and was purchasing a premium brand. Prior to purchasing the Infant Formulas,

Case 1:25-cv-09480    Document 1-1    Filed 11/13/25    Page 12 of 67

Plaintiff Choudhry saw and relied upon the packaging of the Infant Formulas, including the representations "BRAIN BUILDING," "#1 RECOMMENDED BRAND BY PEDIATRICIANS," "THE ONLY HYPOALLERGIC FORMULA WITH LGG® PROBIOTIC," "NO ARTIFICIAL GROWTH HORMONES," "LGG® probiotic to help support digestive health" and "does not use table sugar."

34.     During the time Plaintiff Choudhry purchased and fed her child the Infant Formulas, and due to the misrepresentations, partial misrepresentations and omissions by Defendant, she was unaware the Infant Formulas contained (or had a risk of containing) Heavy Metals and would not have purchased the Infant Formulas if that information had been fully disclosed. Plaintiff Choudhry would be willing to purchase Defendant's Products in the future if she could be certain that they do not contain (or have a risk of containing) Heavy Metals.

35.     As a result of Defendant's intentionally, recklessly, negligently, and/or knowingly deceptive conduct as alleged herein, Plaintiff Choudhry was injured when she paid the purchase price or a price premium for the Infant Formulas that did not deliver what was promised by Defendant. Plaintiff Choudhry paid the purchase price on the reasonable assumptions that the packaging was accurate, the Infant Formulas were free of Heavy Metals, and they posed no potential harm to the physical and mental growth of her infant – long term or short term. Plaintiff Choudhry would not have paid this money had she known the truth about the misrepresentations, partial misrepresentations and omissions. Further, should Plaintiff Choudhry encounter the Infant Formulas in the future, she could not rely on the truthfulness of the packaging absent corrective changes to the packaging and advertising of the Infant Formulas. Damages can be calculated through expert testimony at trial.

36. Plaintiff Kamal Harry is an individual and consumer, not a reseller or merchant. At all times relevant to his claims, he has been a resident of Queens County in the State of New York. He purchased the Infant Formulas, including Enfamil® Nutramigen, for household use.

37. Plaintiff Harry purchased the Infant Formulas for his child from retailers, including but not limited to Amazon.com and brick-and-mortar stores in New York City, between December 2022 and June 2023.

38. Plaintiff Harry believed he was feeding his child high quality and nutritious Infant Formula and was purchasing a premium brand. Prior to purchasing the Infant Formulas, Plaintiff Harry saw and relied upon the packaging of the Infant Formulas, including the representations "BRAIN BUILDING," "#1 RECOMMENDED BRAND BY PEDIATRICIANS," "THE ONLY HYPOALLERGIC FORMULA WITH LGG® PROBIOTIC," "NO ARTIFICIAL GROWTH HORMONES," "LGG® probiotic to help support digestive health" and "does not use table sugar."

39. During the time Plaintiff Harry purchased and fed his child the Infant Formulas, and due to the misrepresentations, partial misrepresentations and omissions by Defendant, he was unaware the Infant Formulas contained (or had a risk of containing) Heavy Metals and would not have purchased the Infant Formulas if that information had been fully disclosed. Plaintiff Harry would be willing to purchase Defendant's Products in the future if he could be certain that they do not contain (or have a risk of containing) Heavy Metals.

40. As a result of Defendant's intentionally, recklessly, negligently, and/or knowingly deceptive conduct as alleged herein, Plaintiff Harry was injured when he paid the purchase price or a price premium for the Infant Formulas that did not deliver what was promised by Defendant. Plaintiff Harry paid the purchase price on the reasonable assumptions that the packaging was accurate, the Infant Formulas were free of Heavy Metals, and they posed no potential harm to the

13

physical and mental growth of his infant – long term or short term. Plaintiff Harry would not have paid this money had he known the truth about the misrepresentations, partial misrepresentations and omissions. Further, should Plaintiff Harry encounter the Infant Formulas in the future, he could not rely on the truthfulness of the packaging, absent corrective changes to the packaging and advertising of the Infant Formulas. Damages can be calculated through expert testimony at trial.

41.    Defendant Mead is a Delaware corporation with its headquarters located in Evansville, Indiana. In June 2017, Mead was acquired and subsequently became a wholly-owned subsidiary of Reckitt Benckiser Group PLC, whose U.S. headquarters is located in Parsippany, New Jersey.

42.    Defendant, one of the largest producers of infant formula products in the world, has formulated, developed, manufactured, packaged, labeled, distributed, marketed, advertised, and sold the Infant Formulas throughout the United States, including in New York. Defendant has done so continuously during the applicable limitations periods to the present (the "Relevant Period").

43.    Defendant intentionally, recklessly, negligently, and/or knowingly created, allowed, oversaw, and/or authorized the unlawful, fraudulent, unfair, misleading, and/or deceptive packaging and related marketing for the Infant Formulas that mispresented or partially misrepresented the high quality and nutritiousness of the Products when, in fact, the Products contained or risk containing Heavy Metals, which was nowhere disclosed on the packaging. Defendant is also responsible for sourcing ingredients, manufacturing the Products, and conducting all relevant quality assurance protocols, including testing the Products and their ingredients.

44.    Plaintiff relied upon the Infant Formulas' packaging and the material misrepresentations, partial misrepresentations and omissions, which were disseminated by

Defendant and its agents in New York on the Products' packaging. The packaging materially misrepresented and partially misrepresented the high quality and nutritiousness of the Products, content that a reasonable consumer would consider important in purchasing the Infant Formulas, because the Products contained or risked containing Heavy Metals, a fact that was not disclosed on the packaging.

45.     The Infant Formulas, at a minimum, include:

(a)     Enfamil® A.R.;



(b)    Enfamil® Gentlease;



(c)    Enfamil® Enspire/Optimum Gentlease;



(d)    Enfamil® NeuroPro;



16

(e)    Enfamil® NeuroPro Sensitive;



(f)    Enfamil® Nutramigen;



17

(g)    Enfamil® ProSobee; and



(h)    PurAmino Hypoallergenic.



## FACTUAL ALLEGATIONS

## I.    DEFENDANT DECEPTIVELY MARKETS AND SELLS THE PRODUCTS

46.    Defendant packages, labels, markets, advertises, formulates, manufactures, distributes, and sells the Infant Formulas throughout the United States, including in New York.

18

Case 1:25-cv-09480    Document 1-1    Filed 11/13/25    Page 19 of 67

47. The Infant Formulas are available at numerous retail and online outlets. The Infant Formulas are widely advertised.

48. Despite knowing that the Products contain (or risk containing) Heavy Metals, and despite doing nothing to alleviate their presence or risk, Defendant markets the Products in a manner that conveys to reasonable consumers, including Plaintiffs, that the Products do not contain Heavy Metals and fails to disclose this fact on the packaging.

49. The Infant Formula packaging misrepresentations and partial misrepresentations (collectively, "Claims") include, but are not limited to the following:

(a) Enfamil® A.R.: "BRAIN BUILDING," "expert-recommended," "#1 RECOMMENDED BRAND BY PEDIATRICIANS," "Calcium for strong bones," and "Vitamin C for immune support."







(i) These statements contradict the inclusion of the harmful Heavy Metals by promising a high quality, safe, healthy, and nutritious infant formula. These partial statements also required Defendant to make a full disclosure of the harmful Heavy Metals.

(b)    Enfamil® Enspire/Optimum Gentlease: "with LACTOFERRIN a key protein also found in BREAST MILK & COLOSTRUM," "BRAIN BUILDING," "IMMUNE HEALTH supported by LACTOFERRIN," and "Naturally occurring MFGM components."



(i)    These statements contradict the inclusion of the harmful Heavy Metals by promising a high quality, safe, healthy, and nutritious infant formula. These partial statements also required Defendant to make a full disclosure of the harmful Heavy Metals.

(c)    Enfamil® Gentlease: "BRAIN BUILDING," "expert-recommended," and "#1 RECOMMENDED BRAND BY PEDIATRICIANS."




(i)    These statements contradict the inclusion of the harmful Heavy Metals by promising a high quality, safe, healthy, and nutritious infant formula. These partial statements also required Defendant to make a full disclosure of the harmful Heavy Metals.

(d)     Enfamil® NeuroPro: "EXCLUSIVE HuMO6 IMMUNE BLEND," "BRAIN BUILDING," "expert-recommended," "inspired by BREAST MILK," "supports IMMUNE HEALTH," "naturally-occurring MFGM components," "#1 RECOMMENDED BRAND BY PEDIATRICIANS," and "Beta Carotene & DHA for baby's eye health".

 



    (i)     These statements contradict the inclusion of the harmful Heavy Metals by promising a high quality, safe, healthy, and nutritious infant formula. These partial statements also required Defendant to make a full disclosure of the harmful Heavy Metals.

(e)     Enfamil® NeuroPro Sensitive: "BRAIN BUILDING," "expert-recommended," "HMO for IMMUNE SUPPORT," "NON-GMO No Artificial Growth Hormones," and "#1 RECOMMENDED BRAND BY PEDIATRICIANS."

  

    (i)     These statements contradict the inclusion of the harmful Heavy Metals by promising a high quality, safe, healthy, and nutritious infant formula. These partial statements also required Defendant to make a full disclosure of the harmful Heavy Metals.

(f)     Enfamil® Nutramigen: "BRAIN BUILDING," "#1 RECOMMENDED BRAND BY PEDIATRICIANS" (front and back), "THE ONLY HYPOALLERGIC FORMULA WITH LGG® PROBIOTIC" (front and back), "NO ARTIFICIAL GROWTH HORMONES," and "LGG® probiotic to help support digestive health" and "does not use table sugar."









(i)     These statements contradict the inclusion of the harmful Heavy Metals by promising a high quality, safe, healthy, and nutritious infant formula. These partial statements also required Defendant to make a full disclosure of the harmful Heavy Metals.

(g)   Enfamil® ProSobee: "No artificial colors, flavors or sweeteners" (front), "BRAIN BUILDING," "expert-recommended," "IMMUNE HEALTH Vitamins A, C, E & Selenium" (front), "#1 RECOMMENDED BRAND BY PEDIATRICIANS," "NO ARTIFICIAL colors, flavors or sweeteners" (back), and "vitamins A, C & E for IMMUNE SUPPORT" (back).





(i)   These statements contradict the inclusion of the harmful Heavy Metals by promising a high quality, safe, healthy, and nutritious infant formula. These partial statements also required Defendant to make a full disclosure of the harmful Heavy Metals.

(h)    PurAmino Hypoallergenic: "amino acid-based powder with iron," "NON GMO," "WHY PURAMINO? Calcium: Phosphorous ratio […] to support strong bones. More than 2X DHA[…] to support brain & eye development," "# 1 TRUSTED HYPOALLERGENIC FORMULA BY PEDIATRICIANS"





(i)    These statements contradict the inclusion of the harmful Heavy Metals by promising a high quality, safe, healthy, and nutritious infant formula. These partial statements also required Defendant to make a full disclosure of the harmful Heavy Metals.

50.    The Claims and omissions suggest the absence of any potentially unsafe or harmful substances in the Products.

51.    The Claims and omissions misled and deceived reasonable consumers because Defendant actively and knowingly misrepresented and partially misrepresented the Products as high quality, healthy, safe, and nutritious while deceptively hiding that the Infant Formulas contained (or had a risk of containing) Heavy Metals, which was not disclosed on the packaging.

52.    Based on the Claims, no reasonable consumer could expect or understand that the Infant Formulas contained (or had a risk of containing) Heavy Metals.

53.     The Claims and omissions wrongfully conveyed to consumers that the Infant

Formulas have a quality and nutritiousness that they do not actually possess.

54.     Defendant also markets its Claims about the Products on its website.[17]




55.     Defendant further promises to "[s]upport their brain with our 5-year benefit, from

just 1 year of our formula supported by MFGM [milk fat globule membrane] components."[18]

Defendant represents that "using Enfamil gives you the confidence you've made the best choice

for your baby."[19] Defendant boasts and reassures parents of the high quality of its products,

claiming "we know you've got lots of questions. Relax. We've got you covered. With a complete

family of brain-building formulas to fuel the wonder of your little one. From everyday nutrition to

specialty formulas."[20] Defendant further states, "Our formulas are backed by decades of research,

so whether you're starting your baby on formula, switching, or supplementing, you can count of

Enfamil. Complete nutrition ages 0-12 months."[21]

---

[17] https://www.enfamil.com/ (last accessed September 24, 2025).

[18] https://www.enfamil.com/enfamil-neuropro/ (last accessed September 24, 2025).

[19] https://www.enfamil.com/why-enfamil/ (last accessed September 24, 2025).

[20]  https://www.enfamil.com/why-enfamil/enfamil-formula-family/ (last accessed September 24, 2025).

[21] *Id.*

Case 1:25-cv-09480    Document 1-1    Filed 11/13/25    Page 26 of 67

56.     Defendant touts its innovations to the Infant Formula and provides extensive information about the ingredients in its formulas to consumers throughout its website, including on its Frequently Asked Questions ("FAQ") page.[22]

57.     Yet, Defendant failed to disclose that the Products contain or risk containing Heavy Metals.

58.     Based on Defendant's decision to package the Infant Formulas as high quality and made with nutritious ingredients, it had a duty to ensure that the Products' packaging was true and not misleading, which it failed to do.

59.     Defendant also had exclusive and/or superior knowledge about the quality and nutritiousness of the Products, including the presence or material risk of Heavy Metals in the Infant Formula, but chose to deceptively mislead consumers about that information, which was not disclosed.

60.     As a result of the Claims and omissions that deceptively hid material information about the quality and nutritiousness of the Infant Formulas, a reasonable consumer would have no reason to suspect the presence (or risk) of Heavy Metals in the Infant Formulas without conducting his or her own scientific tests (which are time consuming and expensive) or reviewing third-party scientific testing of the Products.

61.     Defendant knowingly, recklessly, and/or intentionally misrepresented, partially misrepresented, and failed to disclose on its packaging any mention of the presence (or risk) of Heavy Metals in the Infant Formulas in order to induce and mislead reasonable consumers to purchase the Infant Formulas, including with its Claims and omissions.

---

[22] https://www.enfamil.com/help-center/nutrients-ingredients/ (last accessed September 24, 2025).

Case 1:25-cv-09480    Document 1-1    Filed 11/13/25    Page 27 of 67

62.     Based on Defendant's own marketing of the Infant Formulas as high quality and made with nutritious ingredients to nourish babies, Defendant clearly recognizes the importance of the Infant Formula to the development of infants. Indeed, the presence of Heavy Metals defeats the purpose of infant formula, which is to nourish babies, a fact touted by Defendant.

## II.    THE PRODUCTS CONTAIN HEAVY METALS

63.     Although Defendant misleadingly causes consumers to believe the Infant Formulas do not contain Heavy Metals due to its omissions and Claims, the Infant Formulas do in fact contain undisclosed Heavy Metals, which is material information to reasonable consumers.

64.     Plaintiffs' counsel had seven of Defendant's Infant Formulas tested and that testing confirmed the presence of undisclosed Heavy Metals in the Products:

| Infant Formula | Arsenic (ppb) | Cadmium (ppb) | Lead (ppb) |
|---|---|---|---|
| Enfamil® A.R. | 3.4 | 3.2 | 1.2 |
| Enfamil® Gentlease | 3.7 | 2.6 | 1.7 |
| Enfamil® Enspire/Optimum Gentlease | 5.0 | 2.3 | < 1.0 |
| Enfamil® NeuroPro | < 2.2 | 2.0 | < 1.0 |
| Enfamil® NeuroPro Sensitive | 5.1 | < 1.3 | 2.3 |
| Enfamil® Nutramigen[23] | 7.9 | 4.6 | 6.5 |
| Enfamil® ProSobee | 6.7 | 6.8 | 3.5 |

---

[23] Plaintiffs' counsel again tested the Nutramigen Formula in July 2025 on samples purchased by Plaintiffs' counsel at a CVS store in New York, New York, which revealed Cadmium at 4.39 ppb and Lead at 12.82 ppb.  All other testing was performed in February and March of 2022.

65.    Independent testing also confirmed Heavy Metals in two of Defendant's products:[24]

| Infant Formula | Arsenic (ppb) | Cadmium (ppb) | Lead (ppb) |
|---|---|---|---|
| Enfamil ProSobee | 6.2* | 6.9 | 7.8 |
| Enfamil Infant – Infant Formula Milk-Based with Iron, 0-12 months | < 2.2 | 0.7* | 2.0 |

66.    Additional recent independent testing also confirmed the presence of Heavy Metals in Defendant's Products, including Enfamil Nutramigen and PurAmino Hypoallergenic.[25]

## III.    DEFENDANT KNEW OR SHOULD HAVE KNOWN OF THE HEALTH RISKS PRESENTED TO INFANTS FROM HEAVY METALS

67.    Defendant knew or should have known that Heavy Metals pose health risks to infants.

68.    There are no safe levels of any Heavy Metal.[26]

---

[24] HBBF Report, *supra*, n.10 at 20.

[25] We Tested 41 Baby Formulas for Lead and Arsenic, *supra*, n.11.

[26] *FDA Webinar: Action Levels for Lead in Food Intended for Babies and Young Children: Draft Guidance*, at 5 (March 2, 2023), https://www.fda.gov/media/166188/download (last accessed September 24, 2025) ("Although we may not be able to say the reference level is a safe level, it is a level we could rely on as a benchmark to measure exposure to foods."); *see also* Kevin Loria, *Congressional Report Finds More Problems With Heavy Metals in Baby Food*, CONSUMER REPORTS (Sept. 29, 2021, updated Oct. 20, 2021), https://www.consumerreports.org/food-safety/problems-with-heavy-metals-in-baby-food-congressional-report-a6400080224/ (last accessed September 24, 2025).

69.     While there are no U.S. federal regulations regarding Heavy Metals in infant formulas, it is not due to a lack of risk. According to Linda McCauley, Dean of the Nell Hodgson Woodruff School of Nursing at Emory University, who studies environmental health effects, "No level of exposure to these [heavy] metals has been shown to be safe in vulnerable infants."[27]

70.     Arsenic, cadmium, and lead—the Heavy Metals found in the Infant Formulas—are neurotoxins, or poisons, which affect the nervous system. Exposure to these Heavy Metals "diminish[es] quality of life, reduce[s] academic achievement, and disturb[s] behavior, with profound consequences for the welfare and productivity of entire societies."[28]

71.     The Heavy Metals "can harm a baby's developing brain and nervous system" and cause negative impacts such as "the permanent loss of intellectual capacity and behavioral problems like attention-deficit hyperactivity disorder ('ADHD')."[29] Even when trace amounts are found in food, these Heavy Metals can alter the developing brain and erode a child's intelligence quotient ("IQ").[30]

72.     Heavy Metals can remain in one's body for years and, thus, can accumulate in the body, such as in the kidneys and other internal organs, increasing their risk to a person over time.[31]

---

[27] New York Times, *Some Baby Food May Contain Toxic Metals, U.S. Reports*, available at https://www.nytimes.com/2021/02/04/health/baby-food-metals-arsenic.html (last accessed September 24, 2025) ("Some Baby Food May Contain Toxic Metals").

[28] HBBF Report, *supra*, n.10 at 13.

[29] *Id.* at 6.

[30] *See* Congressional Committee Report, *supra*, n.14 at 2.

[31] *See* Consumer Reports, *Heavy Metals in Baby Food: What You Need to Know* (Aug. 16, 2018, updated June 27, 2023), available at https://www.consumerreports.org/food-safety/heavy-metals-in-baby-food/ (last accessed September 24, 2025) ("Consumer Reports: Heavy Metals in Baby Food").

73.     Due to their smaller physical size and still-developing brain and organs, infants and toddlers are particularly susceptible to the toxic effects of Heavy Metals because "[t]hey also absorb more of the heavy metals that get into their bodies than adults do."[32]

74.     Of additional concern to developing infants are the health risks related to simultaneous exposure to multiple Heavy Metals as "co-exposures can have interactive adverse effects."[33] Heavy Metals disturb the body's metabolism and cause "malfunctioning of cells and ultimately toxicity."[34] For example, lead toxicity causes "significant changes in various biological processes such as cell adhesion, intra- and inter-cellular signaling, protein folding, maturation, apoptosis, ionic transportation, enzyme regulation, and release of neurotransmitters."[35]

75.     Exposure to Heavy Metals, even in small amounts, can lead to life-long effects. According to Victor Villarreal, Ph.D., Assistant Professor in the Department of Educational Psychology at the University of Texas at San Antonio who has studied the effects of heavy metals on childhood development, "[t]he effects of early exposure to heavy metals can have long-lasting impacts that may be impossible to reverse."[36]

---

[32] *Id.*

[33] Rachel Morello-Frosch, et. al., *Environmental Chemicals in an Urban Population of Pregnant Women and their Newborns from San Francisco*, 50 Environ. Sci. & Technol. 12464, 12465 (2016), available at https://stacks.cdc.gov/view/cdc/80511 (last accessed September 25, 2025).

[34] Monisha Jaishankar, et. al., *Toxicity, Mechanism and Health Effects of Some Heavy Metals*, 7 Interdisciplinary Toxicology 60, 60-61 (2014), available at https://doi.org/10.2478/intox-2014-0009 (last accessed September 25, 2025).

[35] *Id.* at 62.

[36] Consumer Reports: Heavy Metals in Baby Food, *supra*, n.31.

76.     Because Heavy Metals can bioaccumulate in the body, even regular consumption of small amounts can increase the material risk of various health issues, including the material risk of bladder, lung, and skin cancer; cognitive and reproductive problems; and type 2 diabetes.[37]

77.     As Dr. James E. Rogers, the director of food safety research and testing at Consumer Reports, has said "*[t]here is no safe level of heavy metals*, so the goal should be to have no measurable levels of any heavy metal in baby and toddler foods."[38] This rings particularly true when considering that generally, babies who are 12 months or younger heavily rely on infant formula as a key source of nutrients and that unless breastmilk is an option, formula is the only food babies younger than five months can eat for their development and growth.

78.     Research continues to confirm that exposures to food containing arsenic, cadmium, and lead cause "troubling risks for babies, including cancer and lifelong deficits in intelligence[.]"[39]

79.     The Food and Drug Administration ("FDA") and the WHO have declared Heavy Metals "dangerous to human health, particularly to babies and children, who are most vulnerable to their neurotoxic effects."[40]

***Arsenic***

80.     The Infant Formulas contain (or have a risk of containing) arsenic, which can cause cognitive deficits in children who are exposed early in life, and even neurological problems in

---

[37] *Id.*

[38] Consumer Reports, *Congressional Report Finds More Problems With Heavy Metals in Baby Food* (Sept. 29, 2021, updated Oct. 20, 2021), available at https://www.consumerreports.org/food-safety/problems-with-heavy-metals-in-baby-food-congressional-report-a6400080224/ (last accessed September 24, 2025) (emphasis added).

[39] HBBF Report, *supra*, n.10 at 1.

[40] Congressional Committee Report, *supra*, n.14 at 2.

adults who were exposed as infants.[41] "[E]ven low levels of arsenic exposure can impact a baby's neurodevelopment."[42] "Studies have shown that consuming products with arsenic over time can lead to impaired brain development, growth problems, breathing problems, and a compromised immune system."[43]

81.    Arsenic exposure can also cause respiratory, gastrointestinal, hematological, hepatic, renal, skin, neurological and immunological effects, and damage children's central nervous systems and cognitive development.[44]

82.    Arsenic can cause cancer in humans, as well as diabetes and atherosclerosis, and potentially cardiovascular disease when ingested chronically.[45] Chronic exposure to arsenic has also been associated with dermatological lesions and malignancies.[46]

83.    Moreover, "[t]here is no evidence that the harm caused by arsenic is reversible."[47]

84.    Based on the risks associated with exposure to higher levels of arsenic, both the U.S. Environmental Protection Agency ("EPA") and FDA have set limits concerning the allowable limit of arsenic at 10 ppb for human consumption in apple juice (regulated by the FDA) and

---

[41] *See* HBBF Report, *supra*, n.10 at 13.

[42] Senators' Letter to the FDA (June 22, 2021), available at https://www.klobuchar.senate.gov/public/_cache/files/9/9/996f2cad-5295-432b-a543-f69312988a78/37D015A1AC9DDF0E31B341F629469169.6.22.2021-formatted-letter-to-fda-on-baby-food-recall.pdf (last accessed September 24, 2025).

[43] *Id*.

[44] *See* Congressional Committee Report, *supra*, n.14 at 10.

[45] J. Christopher States, et al., *Prenatal Arsenic Exposure Alters Gene Expression in the Adult Liver to a Proinflammatory State Contributing to Accelerated Atherosclerosis,* PLOo ONE (June 15, 2012), https://doi.org/10.1371/journal.pone.0038713 (last accessed September 24, 2025).

[46] Stephen J. Genuis, et. al., *Toxic Element Contamination of Natural Health Products and Pharmaceutical Preparations,* PLoS ONE (Nov. 21, 2012), https://doi.org/10.1371/journal.pone.0049676 (last accessed September 24, 2025).

[47] *See* HBBF Report, *supra*, n.10 at 13.

drinking water (regulated by the EPA as a maximum contaminant level). The FDA has set the maximum allowable arsenic levels in bottled water at 10 ppb of inorganic arsenic.[48]

85.    Although the FDA has not set the action level for arsenic in infant formulas specifically, "the FDA prioritizes monitoring and regulating products that are more likely to be consumed by very young children."[49]

86.    Despite this, laboratory tests indicate that Defendant sold Products containing undisclosed arsenic levels at 7.9 ppb, an amount that is especially concerning considering the amount of infant formula regularly consumed by developing babies.

***Cadmium***

87.    The Infant Formulas also contain (or have a risk of containing) cadmium, which has been shown to cause anemia, liver disease, and nerve or brain damage in animals that eat or drink it.

88.    Cadmium is linked to neurotoxicity, cancer, and kidney, bone, and heart damage. Scientists have reported a "tripling of risk for learning disabilities and special education among children with higher cadmium exposures, at levels common among U.S. children[.]"[50]

89.    Cadmium, like lead, "displays a troubling ability to cause harm at low levels of exposure."[51] The U.S. Department of Health and Human Services has determined that cadmium

---

[48] *See* Laura Reiley, *New Report Finds Toxic Heavy Metals in Popular Baby Foods. FDA Failed to Warn Consumers of Risk*, The Washington Post (Feb. 4, 2021), available at https://www.washingtonpost.com/business/2021/02/04/toxic-metals-baby-food/ (last accessed September 24, 2025) ("Toxic Heavy Metals in Popular Baby Foods"); *see also* 21 C.F.R. § 165.110(b)(4)(iii)(A).

[49] NutritionInsight.com, *FDA Studies Reveal Drop in Infant Rice Cereal's Arsenic Levels* (March 9, 2020), available at https://www.nutritioninsight.com/news/fda-studies-reveal-drop-in-infant-rice-cereals-arsenic-levels.html (last accessed September 24, 2025).

[50] *See* HBBF Report, *supra*, n.10 at 14.

[51] *Id*.

Case 1:25-cv-09480    Document 1-1    Filed 11/13/25    Page 34 of 67

and cadmium compounds are known human carcinogens, and the EPA has likewise determined that cadmium is a probable human carcinogen.[52] Compounding such concerns is the fact that cadmium has a prolonged half-life as it "sequester[s] in [human] tissue."[53]

90.    The EPA has set a maximum contaminant level for cadmium in drinking water of 5 ppb (*see* 40 C.F.R. §141.62); the FDA has set a maximum level in bottled water to 5 ppb; and the WHO set a maximum cadmium level in drinking water to 3 ppb.[54]

91.    Despite this, laboratory tests indicate that Defendant sold Products containing undisclosed cadmium levels as high as 6.8 ppb.

*Lead*

92.    The Infant Formulas contain (or have a risk of containing) lead, which is "reasonably anticipated to be [a] human carcinogen[]."[55]

93.    Lead exposure can seriously harm the brain and nervous system in infants and children and is associated with a range of negative health outcomes such as behavioral problems, decreased cognitive performance, delayed puberty, and reduced postnatal growth.[56]

94.    Exposure to lead in food builds up over time. Build-up can and has been scientifically demonstrated to lead to the development of chronic poisoning, cancer,

---

[52] *See* CDC, Agency for Toxic Substances and Disease Registry, *Public Health Statement for Cadmium*, available at https://wwwn.cdc.gov/TSP/PHS/PHS.aspx?phsid=46&toxid=15 (last accessed September 24, 2025).

[53] Toxic Element Contamination of Natural Health Products, *supra*, n.46.

[54] *See* Congressional Committee Report, *supra*, n.14 at 29.

[55] *See* American Cancer Society, *Known and Probable Carcinogens*, last revised March 25, 2024, available at https://www.cancer.org/cancer/cancer-causes/general-info/known-and-probable-human-carcinogens.html (last accessed September 24, 2025).

[56] CDC, Childhood Lead Poisoning Prevention, *Risk Factors and Children*, available at https://www.cdc.gov/lead-prevention/risk-factors/children.html (last accessed September 25, 2025).

developmental, and reproductive disorders, as well as serious injuries to the nervous system, and other organs and body systems.

95.     Even very low exposure levels to lead can "cause lower academic achievement, attention deficits and behavior problems. No safe level of exposure has been identified."[57] The FDA, CDC, AAP, and the WHO have all stated there is no safe level of lead.[58]

96.     Lead is extremely toxic, and its effects cannot be reversed or remediated.[59]

97.     One study found that "children age 0 to 24 months lose more than 11 million IQ points from exposure to arsenic and lead in food."[60] Additionally, studies have established a link between lead exposure and ADHD.[61]

98.     The FDA has established industry guidance on action levels for lead in processed food intended for babies and young children, not including infant formula, ranging from 10 ppb to 20 ppb.[62]

---

[57] *See* HBBF Report, *supra*, n.10 at 13.

[58] *See* FDA, *Lead in Food and Foodwares*, available at https://www.fda.gov/food/environmental-contaminants-food/lead-food-and-foodwares (last accessed September 24, 2025) ("Lead in Food and Foodwares"); CDC, *Health Effects of Lead Exposure*, available at https://www.cdc.gov/lead-prevention/symptoms-complications/?CDC_AAref_Val=https://www.cdc.gov/nceh/lead/prevention/health-effects.htm (last accessed September 24, 2025); AAP, Lead Exposure in Children, available at https://www.aap.org/en/patient-care/lead-exposure/lead-exposure-in-children/ (last accessed September 24, 2025); WHO, *Lead Poisoning*, available at https://www.who.int/news-room/fact-sheets/detail/lead-poisoning-and-health (last accessed September 24, 2025); *see also* USA Today, *FDA: Recalled Applesauce Pouches Had Elevated Lead Levels and Another Possible Contaminant* (Jan. 5, 2024), available at https://www.usatoday.com/story/money/food/2024/01/05/applesauce-pouch-recall-contamination-spreads/72121869007/ (last accessed September 24, 2025).

[59] *See* Consumer Reports: Heavy Metals in Baby Food, *supra*, n.31.

[60] *See* HBBF Report, *supra*, n.10 at 7.

[61] *See* Congressional Committee Report, *supra*, n.14 at 12.

[62] *See* FDA, *Action Levels for Lead in Processed Food Intended for Babies and Young Children: Guidance for Industry* (Jan. 2025), https://www.fda.gov/media/164684/download (last accessed September 24, 2025).

35

99.     Because of public health efforts, exposure to lead has consistently and notably decreased over the past 45 years.[63] These efforts include increasing awareness of the dangers of even low levels of lead exposure to young children.[64] The progress towards decreasing childhood exposure to lead was so impressive that the CDC identified "childhood lead poisoning prevention as 1 of 10 great U.S. public health achievements during 2001 to 2010."[65]

100.    However, health experts, including the AAP, the Environmental Defense Fund, and Consumer Reports, have agreed that lead in baby foods should not exceed 1 ppb.[66]

101.    Despite this, laboratory tests indicate Defendant sold Products containing undisclosed lead levels as high as 12.82 ppb.[67]

102.    The Heavy Metals – arsenic, cadmium, and lead– are significant detriments to children.

103.    The FDA has acknowledged that "exposure to these [ heavy metals] are likely to have the most significant impact on public health."[68]

104.    While the FDA is working on action levels related to Heavy Metals in baby foods, importantly, the FDA's action levels do not require disclosure of the presence of Heavy Metals on

---

[63] *See* Timothy Dignam, T., Kaufmann, R. B., LeStourgeon, L., & Brown, M. J. (2019),et al., *Control of Lead Sources in the United States, 1970-2017: Public Health Progress and Current Challenges to Eliminating Lead Exposure.*, JOURNAL OF PUBLIC HEALTH MANAGEMENT AND PRACTICE: JPHMP, (Jan.-Feb. 2019), 25 Suppl 1, Lead Poisoning Prevention (Suppl 1 LEAD POISONING PREVENTION), S13–S22. Available at, https://www.ncbi.nlm.nih.gov/pmc/articlesarticles/PMC6522252/ (last accessed September 24, 2025).

[64] *See id.*

[65] *Id.*

[66] *See* Toxic Heavy Metals in Popular Baby Foods, *supra*, n.48.

[67] *See supra*, n.23.

[68] FDA, *Environmental Contaminants in Food*, available at https://www.fda.gov/food/chemical-contaminants-pesticides/environmental-contaminants-food (last accessed September 24, 2025).

the packaging of products that are placed in the market. Action levels only set limits for determining when products cannot be placed in the market.

105.    Regardless of level, though, as stated herein, no level of Heavy Metals is safe.[69]

106.    In fact, the FDA requested $1.2 billion from the U.S. Congress for its Foods Program for initiatives such as reduction of heavy metals in foods for infants and young children.[70] A portion of the funding would be for educational outreach about heavy metals in foods.[71, 72]

107.    As such, the knowledge of the risks associated with exposure to Heavy Metals is not a new phenomenon. Defendant knew or should have known the risks associated with the presence of Heavy Metals in foods consumed by infants,[73] and that, over time, these toxins can accumulate and remain in infants' bodies, to their detriment.

108.    Despite the known risks of exposure to Heavy Metals, Defendant has intentionally, recklessly, and/or knowingly sold the Infant Formulas while misrepresenting and partially

---

[69] *See* Some Baby Food May Contain Toxic Metals, *supra*, n.27. *See FDA Webinar: Action Levels for Lead in Food Intended for Babies and Young Children: Draft Guidance*, at 5 (March 2, 2023), https://www.fda.gov/media/166188/download (last accessed September 24, 2025) ("Although we may not be able to say the reference level is a safe level, it is a level we could rely on as a benchmark to measure exposure to foods."); Kevin Loria, *Congressional Report Finds More Problems With Heavy Metals in Baby Food*, CONSUMER REPORTS (Sept. 29, 2021, updated Oct. 20, 2021), https://www.consumerreports.org/food-safety/problems-with-heavy-metals-in-baby-food-congressional-report-a6400080224 (last accessed September 24, 2025).

[70] *See* Department of Health and Human Services Fiscal Year 2023: *Food and Drug Administration, Justification of Estimates for Appropriations Committees*, available at https://www.fda.gov/media/157192/download?attachment (last accessed September 24, 2025).

[71] *See id.*

[72] *See* Congressional Committee Report, *supra*, n.14 at 2.

[73] *See*, *e.g.*, *FDA Compliance Program Guidance Manual: Toxic Elements in Food and Foodware, and Radionuclides in Food- Import and Domestic*, available at http://wayback.archive-it.org/7993/20170404233343/https://www.fda.gov/downloads/Food/ComplianceEnforcement/UCM073204.pdf (last accessed September 24, 2025); *see also* 21 CFR §172, available at https://www.ecfr.gov/current/title-21/chapter-I/subchapter-B/part-172 (last accessed September 24, 2025).

misrepresenting the high quality and nutritiousness of the Products and has omitted from the packaging that the Products contained or risked containing Heavy Metals.

109.    In fact, baby food manufacturers who sell their products in California are now required to test their products monthly for heavy metals and make those test results publicly available on their websites.[74] For example, Plum Organics and Nurture now disclose heavy metals test results for their products on their websites through QR codes on the products' packaging.[75] Illinois has enacted similar legislation.[76] While manufacturers including Gerber and Beech-Nut have decided to place the QR codes directing to test results on packaging nationwide, Defendant has chosen to not do the same.[77]

---

[74] Food Safety Magazine Editorial Team, *California Passes Law Requiring Tests for Toxic Heavy Metals in Baby Foods, Disclosure of Results*, FoodSafety, Oct. 23, 2023, https://www.food-safety.com/articles/8979-california-passes-law-requiring-tests-for-toxic-heavy-metals-in-baby-foods-disclosure-of-results (last accessed September 24, 2025); *see also* ¶¶ 113-114.

[75] *See* Plum's heavy metals test results for pouches available at https://plumorganics.com/heavy-metals-test-results-for-pouches/ and for snacks available at https://plumorganics.com/heavy-metal-test-results-for-snacks/; Plum Organics Stage 2 banana + pumpkin, available at https://plumorganics.com/products/banana-pumpkin-baby-food/; Nurture heavy metals test results available https://www.happyfamilyorganics.com/product-finder-results/; HappyBaby Organics Clearly Crafted Stage 2 Green Beans, Spinach, & Pears, available at https://www.target.com/p/happybaby-clearly-crafted-green-beans-pears-38-spinach-baby-food-pouch-4oz/-/A-50704733#lnk=sametab (last accessed September 24, 2025).

[76] *See* Illinois Senate Bill 73, as enacted, Public Act 104-0345, available at https://legiscan.com/IL/amendment/SB0073/id/232055 (last accessed September 24, 2025) (law requiring baby food manufacturers to test for and disclose heavy metal test results).

[77] Sandee LaMotte, *Baby food labels will reveal levels of lead, other heavy metals for first time*, CNN, Jan. 7, 2025, available at https://edition.cnn.com/2025/01/04/health/baby-food-qr-codes-wellness/index.html (last accessed September 24, 2025).

Case 1:25-cv-09480   Document 1-1   Filed 11/13/25   Page 39 of 67

## IV.  DEFENDANT KNEW THE QUALITY AND NUTRITIOUSNESS OF THE INFANT FORMULAS, INCLUDING THE PRESENCE OR RISK OF HEAVY METALS, IS MATERIAL TO CONSUMERS

110.     Defendant knew consumers purchased the Infant Formulas based on the reasonable expectation that Defendant manufactured the Infant Formulas to the highest standards. In fact, Defendant promised as much – at length – on its website:

> Our products meet or exceed all **infant formula requirements set out by the FDA**, which are among the **most rigorous** in the food industry. Each of our manufacturing facilities adheres to safety guidelines among the **most rigorous in the food industry** and our own **stringent quality standards** so that we can assure the highest quality products. Parents can be assured that our infant formulas are safe and nutritious feeding options for their infants when prepared, stored, and handled according to package directions.
>
> Our infant products undergo **extensive quality and safety checks** throughout the manufacturing process—from raw materials to finished product. A representative number of samples from every batch we produce are tested to ensure the product meets our **stringent quality standards**. Each batch of our products is assured to meet our **high quality and safety standards** as verified by our **proprietary Quality Systems** that exist in every manufacturing facility. We distribute our products only if they pass our **strict testing**. We track the path of every ingredient in our infant and toddler products from its initial supplier through all processing stages until it reaches our consumer.
>
> The [FDA] has very **specific and rigorous manufacturing standards** for infant formulas and toddler drinks that we adhere to. All Mead Johnson formulas are in compliance with all FDA regulations, including Enfamil® NeuroPro™, Enfamil® Enspire™, Enfamil® Optimum™, Enfamil® Gentlease®, and Nutramigen®. Our products meet or exceed all **infant formula requirements set out by the FDA**, which are among the **most rigorous** in the food industry. The amounts of ingredients in Enfamil Infant Formulas are all within required guidelines established to ensure the safety and nutritional quality of infant formulas. **We are committed to the most stringent manufacturing, packaging, and quality assurance procedures.**[78]

---

[78] https://www.enfamil.com/why-enfamil/quality-assurance/ (last accessed September 24, 2025) (emphasis added).

Case 1:25-cv-09480    Document 1-1    Filed 11/13/25    Page 40 of 67

111.    Based on consumers' expectation that Defendant manufactured the Infant Formulas to the highest standards, Defendant knew or should have known consumers reasonably inferred that Defendant would hold the Infant Formulas to the highest standards for preventing the inclusion of Heavy Metals in the Infant Formulas, which would include testing the Products and their ingredients for Heavy Metals.

112.    A consumer survey done by Plaintiffs' counsel ("Plaintiffs' Consumer Survey") demonstrates such an expectation.[79]

| Plaintiffs' Consumer Survey | Yes | No |
|---|---|---|
| Do you expect a company to test for arsenic, cadmium, lead, and/or mercury in infant formula that will be fed to infants? | 91.1% | 8.9% |
| Would you expect a company to disclose if there were detectable levels, or risk, of arsenic, cadmium, lead, and/or mercury in an infant formula? | 91.3% | 8.7% |

113.    Further, Defendant has recognized consumer concern for the possible presence of Heavy Metals in baby food products and infant formulas. As a member of the Infant Nutrition Council of America ("INCA") through its parent company Reckitt Benckiser Group PLC, Defendant joined two other major manufacturers of infant formula products to lobby against the promulgation of California Assembly Bill 899 ("AB 899") in 2023.[80] As introduced, the original version of California AB 899 would have required infant formula manufacturers – like Defendant – to test for Heavy Metals in their products and disclose the testing results on the labels.[81] INCA

---

[79] All Consumer Survey respondents were parents 18 and over with children aged anywhere from 0 to 4 years old from a majority of states, including New York, and all of whom had purchased infant formula within the three-year period prior to February 26, 2024.

[80] *See* Analysis of AB 899 as amended March 13, 2023, available at https://billtexts.s3.amazonaws.com/ca/ca-analysishttps-leginfo-legislature-ca-gov-faces-billAnalysisClient-xhtml-bill-id-202320240AB899-ca-analysis-357755.pdf (last accessed September 24, 2025) ("Analysis of AB 899").

[81] *See id.*

Case 1:25-cv-09480    Document 1-1    Filed 11/13/25    Page 41 of 67

vehemently opposed any disclosure of Heavy Metals to consumers, arguing the proposed measure would "create confusion"[82] among consumers and "create fear and panic,"[83] and cause them to "mistrust" the manufacturers.[84] Furthermore, INCA has argued that such requirements would cause consumers to change their purchasing behaviors.[85]

114.    The bill ultimately became law without reference to infant formulas.[86]

115.    Based on the foregoing, reasonable consumers, like Plaintiffs, would consider the quality and nutritiousness of the Products and the inclusion (or risk of inclusion) of Heavy Metals material when considering purchasing infant formula.

116.    Defendant knew that monitoring for Heavy Metals in the Infant Formulas and their ingredients was not only important, but also critical.

117.    Defendant also knew that monitoring Heavy Metals was likewise important to its consumers to protect their babies.

## V.    DEFENDANT KNEW OR SHOULD HAVE KNOWN OF THE LIKELIHOOD OF HEAVY METALS IN ITS PRODUCTS AND THAT IT COULD MANUFACTURE INFANT FORMULA WITHOUT MEASURABLE LEVELS OF HEAVY METALS

118.    At all times during the Relevant Period, Defendant knew or should have known the Infant Formulas contained or risked containing Heavy Metals that were inconsistent with its

---

[82] *Id.*; *see also* Analysis of AB 899 as amended April 12, 2023, available at https://trackbill.com/s3/bills/CA/2023/AB/899/analyses/senate-health.pdf (last accessed September 24, 2025) ("Analysis of AB 899 as amended April 12, 2023").

[83] Analysis of AB 899, *supra*, n.80.

[84] *Id*.

[85] *See* Analysis of AB 899 as amended April 12, 2023, *supra*, n.82.

[86] *See* Food Safety Magazine, *California Passes Law Requiring Tests for Toxic Heavy Metals in Baby Foods, Disclosure of Results* (Oct. 23, 2023), https://www.food-safety.com/articles/8979-california-passes-law-requiring-tests-for-toxic-heavy-metals-in-baby-foods-disclosure-of-results (last accessed September 24, 2025).

Claims and not disclosed, and that the Products were not sufficiently monitored or tested for the presence and material risk of Heavy Metals.

119.    The presence of Heavy Metals and/or other undesirable toxins or contaminants in baby foods have been confirmed by investigations and reports by the U.S. Congress, Healthy Babies Bright Futures,[87] Consumer Reports,[88] and Politico,[89] and studies by the FDA,[90] University of Miami, the Clean Label Project, and Ellipse Analytics.[91]

120.    Both the first Congressional Committee Report, published on February 4, 2021, which acknowledged that Heavy Metals "can endanger infant neurological development,"[92] followed by a second report published on September 29, 2021, revealed alarming levels of Heavy Metals in baby foods.[93] The Congressional Committee Report acknowledged that Heavy Metals—

---

[87] *See*, *generally*, HBBF Report, *supra*, n.10.

[88] *See* Consumer Reports: Heavy Metals in Baby Food, *supra*, n.31; We Tested 41 Baby Formulas for Lead and Arsenic, *supra*, n.11.

[89] *See* Helen Bottemiller Evich, *The FDA's Food Failure*, POLITICO (Apr. 8, 2022), available at https://www.politico.com/interactives/2022/fda-fails-regulate-food-health-safety-hazards/ (last accessed September 24, 2025).

[90] *See* FDA, *FDA Total Diet Study Report, Fiscal Years 2018-2020 Elements Data (July 2022)*, available at https://www.fda.gov/media/159751/download?attachmenthttps://www.fda.gov/media/159745/download?attachment (last accessed September 24, 2025) ("FDA Total Diet Study").

[91] *See* Hannah Gardener, et al., *Lead and Cadmium Contamination in A Large Sample of United States Infant Formulas and Baby Foods*, 651 Sci. Total Environ.822 (Feb. 15, 2019), available at https://www.sciencedirect.com/science/article/abs/pii/S0048969718334442pii/S00489697 18334442?via%3Dihub (last accessed September 24, 2025) ("Lead and Cadmium Contamination in Infant Formulas and Baby Foods").).

[92] Toxic Heavy Metals in Popular Baby Foods, *supra*, n.48; *see also* Congressional Committee Report, *supra*, n.14 at 2.

[93] *See* Congressional Committee Report, *supra*, n.14; Second Congressional Committee Report, *supra*, n.14 at 2.

including arsenic, cadmium, and lead—were present in "significant levels" in numerous commercial baby food products.[94]

121.    In contrast to the levels of Heavy Metals found in Defendant's Products, other companies have manufactured infant formulas that have non-detectable levels of Heavy Metals. Even Defendant itself has manufactured Products without measurable levels of Heavy Metals.[95]

122.    In contrast to the levels of Heavy Metals found in Defendant's Infant Formulas, other infant formula manufacturers have produced products that have non-detectable levels of Heavy Metals.

123.    The Clean Label Project tests products for more than 400 contaminants, including heavy metals, chemicals, and plastics, and presents its Purity Award to companies with products with the lowest levels of contaminants when compared to other products in a given category.[96]

124.    Bobbie, a manufacturer of infant formula was a recipient of the Clean Label Project's Purity Award for manufacturing products that were free from detectable levels of Heavy Metals.[97]

125.    Plaintiffs' counsel had Bobbie Organic Infant Formula independently tested and that testing confirmed the presence of Heavy Metals at non-detectable levels:

| Infant Formula | Arsenic (ppb) | Cadmium (ppb) | Lead (ppb) |
|---|---|---|---|

---

[94] *See* Congressional Committee Report, *supra*, n.14.

[95] *See* Consumer Reports: Heavy Metals in Baby Food, *supra*, n.31; We Tested 41 Baby Formulas for Lead and Arsenic, *supra*, n.11.

[96] Clean Label Project Purity Award, available at https://cleanlabelproject.org/purity-award/ (last accessed September 24, 2025).

[97] *See* Business Wire, *Bobbie is First-Ever Infant Formula to Receive the Clean Label Project Purity Award and Certification as a Pesticide-Free Product* (Jan. 25, 2022), available at https://www.businesswire.com/news/home/20220125005905/en/Bobbie-Is-First-Ever-Infant-Formula-To-Receive-The-Clean-Label-Project-Purity-Award-and-Certification-as-a-Pesticide-Free-Product (last accessed September 24, 2025).

| Bobbie Organic Infant Formula | < 2.2 | < 1.3 | < 1.0 |

126.     This testing confirms infant formula manufacturers can manufacture infant formulas with Heavy Metals levels that are not measurable.

127.     Additionally, testing by Consumer Reports identified baby food products with Heavy Metal levels that were not measurable.[98] "[T]here are ways for [baby food] manufacturers to significantly reduce or eliminate these [heavy] metals from their products."[99]

128.     In testing conducted by Consumer Reports, other products had non-detectable levels of Heavy Metals.[100] As stated by Dr. James E. Rogers, the Consumer Reports' Director of Food Safety Research and Testing, "[e]very category of food was represented in that lower-risk group. That indicates that there are ways for manufacturers to significantly reduce or eliminate these [heavy] metals from their products."[101]

129.     More recently, Consumer Reports tested additional infant formula products for Heavy Metals, and several had no detectable levels of Heavy Metals, including five of Defendant's Products.[102]

130.     In the FDA Total Diet Study, it was also demonstrated that infant formulas can be manufactured without detectable levels of Heavy Metals.[103]

131.     Defendant knew or should have known it could control the levels of Heavy Metals in the Infant Formulas to achieve non-detectable or zero levels by adequately monitoring its

---

[98] *See* Consumer Reports: Heavy Metals in Baby Food, *supra*, n.31.

[99] *Id.*

[100] *See id.*

[101] *Id.*

[102] We Tested 41 Baby Formulas for Lead and Arsenic, *supra*, n.11.

[103] *See* FDA Total Diet Study, *supra*, n.90 at 73, 81-82.

Case 1:25-cv-09480    Document 1-1    Filed 11/13/25    Page 45 of 67

ingredients for Heavy Metals and adjusting any formulation to reduce ingredients that contained Heavy Metals.

132.    The Infant Formulas contain Heavy Metals due to Defendant's failure to monitor for the presence of Heavy Metals in the Products and their ingredients.  Defendant was aware of this risk and deceptively hid that risk from Plaintiffs and the Classes through its Claims despite having a duty to disclose, and failed to disclose the presence or risk of Heavy Metals.

133.    Throughout the Relevant Period, Defendant knew it was not adequately monitoring and testing for Heavy Metals in the Infant Formulas and their ingredients and instead misrepresented, partially misrepresented and omitted the quality and nutritiousness of the Products.

134.    Defendant knew or should have known that it owed consumers a duty of care to prevent or, at the very least, minimize the presence of Heavy Metals in the Infant Formulas to an undetectable level.

135.    Defendant knew or should have known it owed consumers a duty of care to adequately test for Heavy Metals in the Infant Formulas and their ingredients.

136.    Despite the material risk and/or presence of these harmful chemicals, Defendant misrepresented and partially misrepresented the high quality and nutritiousness of the Products when it knew that the Products contained or risked containing Heavy Metals, which it failed to disclose.

137.    Defendant's Claims were misleading due to its failure to properly and sufficiently monitor and test for Heavy Metals.

138.    Defendant knew or should have known consumers paid a price premium for the Products and expected Defendant to test and monitor for Heavy Metals and disclose on the

Case 1:25-cv-09480    Document 1-1    Filed 11/13/25    Page 46 of 67

packaging of the Products the presence or material risk of Heavy Metals in the Infant Formulas and their ingredients.

139.     Defendant knew or should have known that consumers reasonably expected it to test for and monitor the presence of Heavy Metals in the Infant Formulas and their ingredients, and to disclose the presence or material risk of any levels of Heavy Metals in its Products. Instead, Defendant misrepresented and partially misrepresented the high quality and nutritiousness of the Products and failed to disclose the presence or risk of Heavy Metals.

140.     Defendant knew or should have known that, in order to comply with its marketing, consumers expected it to ensure the Infant Formulas and their ingredients were monitored and tested for Heavy Metals, and to disclose the presence (or risk) of Heavy Metals.

141.     Defendant knew, yet misrepresented, partially misrepresented and omitted its lack of adequate testing and/or knowledge of the risk or presence of Heavy Metals in the Infant Formulas and their ingredients.

142.     Defendant's packaging is false, misleading, and crafted to deceive the public as it creates an impression that the Infant Formulas are high quality, nutritious, and safe from the risk or presence of Heavy Metals. The presence or risk of Heavy Metals defeats the purpose of the Products, which is nutrition for infants.

143.     Moreover, reasonable consumers, such as Plaintiffs and the Classes, would have no reason to doubt Defendant's packaging. But Defendant's Claims about the high quality and nutritiousness of the Products were intended to hide the presence (or risk) of Heavy Metals in the Infant Formulas and deceived consumers like Plaintiffs and the Classes to purchase Products they would not have or for which they would not have paid a premium price if the true quality of the Products and their ingredients were known but was not disclosed to Plaintiffs and the Classes.

## VI. DEFENDANT'S CLAIMS AND OMISSIONS MISLED REASONABLE CONSUMERS

144.    Based on the Claims and omitted material information, a reasonable consumer would not expect the presence of Heavy Metals in the Infant Formulas, nor would a reasonable consumer be able to detect the presence of Heavy Metals in the Infant Formulas, without conducting his or her own scientific tests or reviewing scientific testing conducted on the Products.

145.    Reasonable consumers must and do rely on Defendant to honestly report what the Infant Formulas contain.

146.    Plaintiffs relied on the Products' packaging and Claims and omissions when making their purchasing decisions.

147.    Plaintiffs' expectations and reliance are consistent with reasonable consumers as shown by the Plaintiffs' Consumer Survey:

| Plaintiffs' Consumer Survey | | No | Yes |
|---|---|---|---|
| After seeing the label would you expect arsenic, cadmium, lead, and/or mercury in the infant formula? | | 77.8% | 22.2% |
| Plaintiffs' Consumer Survey | Very important | Important | Not at all important |
| Please select how important, if at all, would it be to your purchasing decision if the infant formula you purchased contained, or risked containing, even a small amount of arsenic, cadmium, lead, and/or mercury. | 71.0% | 25.4% | 3.6% |

148.    Defendant acted knowingly, recklessly, negligently, and/or intentionally when it placed its misleading Claims on the Products' packaging and failed to disclose the presence or risk of Heavy Metals.

149.    Defendant had a duty to ensure the Infant Formulas were not deceptively, misleadingly, unfairly, and/or falsely marketed and all material information was properly and fully disclosed. For example, as the FDA recently stated in connection with the recall of applesauce due

47

Case 1:25-cv-09480    Document 1-1    Filed 11/13/25    Page 48 of 67

to the presence of lead, "Companies have the responsibility to take steps to assure that the products they manufacture are not contaminated with unsafe levels of heavy metals."[104] Notably, the FDA acknowledges that there is no safe level of any heavy metal.[105]

150.    Defendant knew or should have been aware that a reasonable consumer would be feeding the Infant Formula multiple times each day to his or her baby, making it a significant source of food and nutrition for the child.  As a result, infants are repeatedly exposed to Heavy Metals, which defeats the purpose of infant formula, *i.e.*, to provide nourishment to infants.

151.    Finally, Defendant knew or should have known it could control the levels of Heavy Metals in the Infant Formulas by properly monitoring their ingredients for Heavy Metals and adjusting any formulation to reduce ingredients that contained or risked containing Heavy Metals.

152.    The Claims and omissions are material and reasonably likely to deceive reasonable consumers, such as Plaintiffs, in their purchasing decisions. This is true especially considering the long-standing campaign by Defendant to market the Infant Formulas as high quality and made with nutritious ingredients, and to induce consumers, such as Plaintiffs, to purchase the Products.

153.    The Claims and omissions make the Infant Formulas' packaging deceptive. Reasonable consumers, like Plaintiffs, would consider the fact that the Infant Formula contained (or had a risk of containing) Heavy Metals when considering purchasing infant formula.

154.    At all times during the Relevant Period, Defendant knew it was not following proper manufacturing standards when it did not sufficiently and consistently monitor or test the Infant Formulas or their ingredients for Heavy Metals.

---

[104] Christina Jewett and Will Fitzgibbon, *Lead-Tainted Applesauce Sailed Through Gaps in Food-Safety System*, N.Y. Times, Feb. 27, 2024, available at https://www.nytimes.com/2024/02/27/world/europe/lead-applesauce-food-safety.html (last accessed September 24, 2025).

[105] Lead in Food and Foodwares, *supra*, n.58.

155.    Defendant's Claims were misleading about the true quality and nutritiousness of the Infant Formulas based on its failure to disclose the presence or material risk of Heavy Metals.

156.    Defendant knew or should have known the Infant Formulas contained or risked containing undisclosed levels of Heavy Metals that were inconsistent with Defendant's Claims.

157.    Defendant knew or should have known that reasonable consumers expected it to have sufficient and adequate manufacturing processes that would ensure the Infant Formulas and their ingredients were monitored and tested for Heavy Metals to ensure compliance with Defendant's Claims.

158.    Defendant knew or should have known consumers paid premium prices because it misrepresented and partially misrepresented the high quality and nutritiousness of the Products and failed to disclose the presence or risk of Heavy Metals in the Products.

159.    The Claims and omissions are material and render the Infant Formulas' packaging deceptive as without full disclosure, reasonable consumers believe the Infant Formulas are high quality and nutritious, when, in fact, the Products contain or risk containing Heavy Metals.

160.    Moreover, reasonable consumers, such as Plaintiffs and the Classes, would have no reason to doubt or question Defendant's statements regarding the quality and nutritiousness of the Infant Formulas. Based on the Claims and omissions, no reasonable consumer could expect or understand the Infant Formula contained (or had a risk of containing) Heavy Metals.

161.    The Claims and omissions were intended to and did, in fact, cause consumers like Plaintiffs and the Classes to purchase products they would not have if the true quality and nutritiousness of the Products and their ingredients were disclosed or for which they would not have paid a premium price.

Case 1:25-cv-09480     Document 1-1     Filed 11/13/25     Page 50 of 67

162.    As a result of Defendant's Claims, omissions and deceptive packaging of the Infant Formulas, Defendant was able to generate substantial sales, which allowed Defendant to capitalize on, and reap enormous profits from, consumers who paid the purchase price or premium for the Infant Formulas that were not as advertised.

## VII.    PLAINTIFFS' RELIANCE WAS REASONABLE AND FORESEEN BY DEFENDANT

163.    Plaintiffs read and relied upon the packaging of the Infant Formulas when making their purchasing decisions. Had they known Defendant misrepresented and partially misrepresented the quality and nutritiousness of the Products and failed to disclose the Infant Formula contained (or had a risk of containing) Heavy Metals, they would not have purchased the Infant Formulas or paid a premium price.

164.    A reasonable consumer would consider the packaging of a product when deciding whether to purchase it.

## VIII.    PRIVITY EXISTS WITH PLAINTIFFS AND THE PROPOSED CLASSES

165.    Defendant knew that reasonable consumers such as Plaintiffs and the proposed Classes would be the end purchasers of the Infant Formulas and the targets of its advertising, marketing, packaging, statements, Claims and omissions.

166.    Defendant intended that the packaging and implied warranties would be considered by the end purchasers of the Infant Formulas, including Plaintiffs and the proposed Class members.

167.    Defendant directly marketed to Plaintiffs and the proposed Classes through its packaging.

168.    Plaintiffs and the proposed Classes are the intended beneficiaries of the implied warranties.

Case 1:25-cv-09480    Document 1-1    Filed 11/13/25    Page 51 of 67

## IX. APPLICABILITY OF EQUITABLE TOLLING AND THE DISCOVERY RULE TO THE STATUTE OF LIMITATIONS

169.    Fraudulent concealment and/or the discovery rule toll Plaintiffs' claims.

170.    The statute of limitations is tolled for all of Plaintiffs' statutory consumer protection and common law claims due to Defendant's fraudulent concealment that the Infant Formulas contained (or had a risk of containing) Heavy Metals. Defendant intentionally concealed these material facts from Plaintiffs.

171.    Defendant knew the presence or risk of Heavy Metals was a material consideration for any parent buying infant formulas, including Plaintiffs and the Classes.

172.    Defendant violated the relevant state consumer fraud acts by deceiving customers as to the true nature, quality, and makeup of the Infant Formulas.

173.    Based on Defendant concealing material facts from Plaintiffs, Plaintiffs could not reasonably discover that the Infant Formulas contained (or had a risk of containing) Heavy Metals.

174.    Plaintiffs did not know that the Infant Formulas contained (or had a risk of containing) Heavy Metals. Instead, Defendant only represented that the Infant Formulas were nutritious, and made of high-quality ingredients to support growing infants.

## CLASS ACTION ALLEGATIONS

175.    Plaintiffs bring this action individually and on behalf of the following class and subclasses pursuant to NY CPLR § 901, et. seq.:

All persons who, during the Relevant Period, purchased the Infant Formulas in New York for household use, and not for resale (the "Class").

## PRODUCT SUBCLASSES

**Enfamil A.R. Subclass**: All persons who, during the Relevant Period, purchased in New York the **Enfamil A.R.** Infant Formulas for household use, and not for resale (the "**A.R.** Subclass").

51

**Enfamil Gentlease Subclass**: All persons who, during the Relevant Period, purchased in New York the **Enfamil Gentlease** Infant Formulas for household use, and not for resale (the "**Gentlease** Subclass").

**Enfamil Enspire/Optimum Gentlease Subclass**: All persons who, during the Relevant Period, purchased in New York the **Enfamil Enspire/Optimum Gentlease** Infant Formulas for household use, and not for resale (the "**Enspire/Optimum Gentlease** Subclass").

**Enfamil NeuroPro Subclass**: All persons who, during the Relevant Period, purchased in New York the **Enfamil NeuroPro** Infant Formulas for household use, and not for resale (the "**NeuroPro** Subclass").

**Enfamil NeuroPro Sensitive Subclass**: All persons who, during the Relevant Period, purchased in New York the **Enfamil NeuroPro Sensitive** Infant Formulas for household use, and not for resale (the "**NeuroPro Sensitive** Subclass").

**Enfamil Nutramigen Subclass**: All persons who, during the Relevant Period, purchased in New York the **Enfamil Nutramigen** Infant Formulas for household use, and not for resale (the "**Nutramigen** Subclass").

**Enfamil ProSobee Subclass**: All persons who, during the Relevant Period, purchased in New York the **Enfamil ProSobee** Infant Formulas for household use, and not for resale (the "**ProSobee** Subclass").

**PurAmino Hypoallergenic Subclass**: All persons who, during the Relevant Period, purchased in New York the **PurAmino Hypoallergenic** Infant Formulas for household use, and not for resale (the "**PurAmino Hypoallergenic** Subclass").

176. The Class and Subclasses are collectively referred to as "the Classes."

177. Excluded from the Classes are the Defendant, any parent companies, subsidiaries, and/or affiliates, officers, directors, legal representatives, employees, all governmental entities, and any judge, justice, or judicial officer presiding over this matter.

178.    This action is brought and may be properly maintained as a class action.  There is a well-defined community of interests in this litigation and the members of the Classes are easily ascertainable.

179.    The members in the proposed Classes are so numerous that individual joinder of all members is impracticable, and the disposition of the claims of the members of all Classes in a single action will provide substantial benefits to the parties and Court.

180.    Questions of law and fact common to Plaintiffs and the Classes include, but are not limited to, the following:

(a)    whether the labels were misleading to a reasonable consumer;

(b)    whether Defendant owed a duty to disclose based on the partial misrepresentations;

(c)    whether Defendant knew or should have known that the Infant Formulas and their ingredients contained or risked containing Heavy Metals;

(d)    whether Defendant misrepresented, partially misrepresented and omitted material information about the Products by failing to disclose the presence or risk of Heavy Metals;

(e)    whether Defendant deceptively hid the presence or risk of Heavy Metals in the Products;

(f)    whether the claims of Plaintiffs and the Classes serve a public benefit;

(g)    whether Defendant's packaging is false, deceptive, and misleading based on the Claims and omissions;

(h)    whether the Claims and omissions are material to a reasonable consumer;

(i)    whether the Claims and omissions are likely to deceive a reasonable consumer;

(j)      whether Defendant had knowledge that Claims and omissions were material and false, deceptive, and/or misleading;

(k)      whether Defendant breached its duty of care;

(l)      whether Defendant breached its duty to disclose;

(m)      whether Defendant breached its implied warranties;

(n)      whether Defendant engaged in unfair trade practices;

(o)      whether Defendant engaged in false advertising;

(p)      whether Defendant violated the laws of the State of New York, including NY GBL §§ 349 & 350;

(q)      whether Defendant engaged in unfair trade practices;

(r)      whether Plaintiffs and the Classes are entitled to actual, statutory, and punitive damages; and

(s)      whether Plaintiffs and the Classes are entitled to declaratory and injunctive relief.

181.    Defendant engaged in a common course of conduct giving rise to the legal rights sought to be enforced by Plaintiffs individually and on behalf of the other members of the Classes. Identical statutory violations and business practices and harm are involved. Individual questions, if any, are not prevalent in comparison to the numerous common questions that dominate this action.

182.    Plaintiffs' claims are typical of those of the members of the Classes in that they are based on the same underlying facts, events, and circumstances relating to Defendant's conduct.

183.    Plaintiffs will fairly and adequately represent and protect the interests of the Classes, have no interests incompatible with the interests of the Classes, and have retained counsel competent and experienced in class action, consumer protection, and false advertising litigation.

184.    Class treatment is superior to other options for resolution of the controversy because the relief sought for each member of the Classes is small such that, absent representative litigation, it would be infeasible for members of the Classes to redress the wrongs done to them.

185.    Questions of law and fact common to the Classes predominate over any questions affecting only individual members of the Classes.

186.    As a result of the foregoing, class treatment is appropriate.

## CLAIMS FOR RELIEF

## COUNT I
### Violation of New York General Business Law § 349
### (*On Behalf of Plaintiffs and the Classes*)

187.    Plaintiffs incorporate by reference and reallege each and every allegation contained above, as though fully set forth herein.

188.    New York General Business Law ("GBL") § 349 declares unlawful "[d]eceptive acts or practices in the conduct of any business, trade or commerce . . . ." GBL § 349(a).

189.    The practices alleged herein – namely, that Defendant made misrepresentations, partial misrepresentations and omissions regarding the Infant Formulas as to its deficient manufacturing processes and the presence or risk of Heavy Metals – are unfair, deceptive, and misleading, in violation of GBL § 349.

190.    The foregoing deceptive acts and practices were consumer-oriented in that they were directed at Plaintiffs and members of the Classes.

55

191.    Defendant's misrepresentations, partial misrepresentations and omissions regarding the Infant Formulas are likely to deceive reasonable consumers and the public.

192.    Defendant's misrepresentations, partial misrepresentations and omissions regarding the Infant Formulas are material to reasonable consumers because they relate to the contents and characteristics of the Infant Formulas purchased by the consumer.

193.    Plaintiffs and members of the Classes have been injured as a direct and proximate result of Defendant's violations described above as they would not have purchased the Infant Formulas, or would have paid significantly less for the Infant Formulas, had they known that the Infant Formulas they purchased contained or risked containing Heavy Metals.

194.    Defendant's conduct is ongoing and continuing, such that prospective injunctive relief is necessary, especially given Plaintiffs' desire to purchase these Products in the future if they can be assured that the Infant Formulas are as advertised and do not contain Heavy Metals.

195.    As a result of Defendant's unlawful actions, Plaintiffs and members of the Classes seek to enjoin Defendant's deceptive and unlawful acts and practices described herein and to recover actual damages, fifty dollars, or both, whichever is greater, as well as treble damages, reasonable attorneys' fees, and all other remedies this Court deems proper.

### COUNT II
### Violation of New York General Business Law § 350
### (*On Behalf of Plaintiffs and the Classes*)

196.    Plaintiffs incorporate by reference and reallege each and every allegation contained above, as though fully set forth herein.

197.    GBL § 350 provides in relevant part: "False advertising in the conduct of any business, trade or commerce . . . in this state is hereby declared unlawful."

198.    In turn, GBL § 350-a defines false advertising as:

advertising, including labeling, of a commodity . . . if such advertising is misleading in a material respect. In determining whether any advertising is misleading, there shall be taken into account (among other things) not only representations made by statement, word, design, device, sound or any combination thereof, but also the extent to which the advertising fails to reveal facts material in the light of such representations with respect to the commodity . . . to which the advertising relates under the conditions prescribed in said advertisement, or under such conditions as are customary or usual.

199.    As set forth herein, Defendant's misrepresentations, partial misrepresentations and omissions were false in that Defendant misrepresented, partially misrepresented and failed to reveal facts material to consumers, namely the true quality of the Infant Formulas based on its deficient manufacturing processes and the presence or material risk of Heavy Metals in violation of GBL § 350.

200.    Defendant knew, or reasonably should have known, that these misrepresentations, partial misrepresentations and omissions were untrue or misleading.

201.    Defendant's conduct is further misleading because in mispresenting, partially misrepresenting and failing to disclose that the Products contained or risked containing Heavy Metals, Defendant induced consumers purchases of the Infant Formulas.

202.    The foregoing misleading acts and practices were consumer-oriented in that they were directed at Plaintiffs and the Classes.

203.    Defendant's misrepresentations, partial misrepresentations and omissions regarding the Infant Formulas are likely to deceive reasonable consumers and the public.

204.    Defendant's misrepresentations, partial misrepresentations and omissions regarding the Infant Formulas are material to reasonable consumers because they relate to the contents and characteristics of the Infant Formulas purchased by the consumers.

Case 1:25-cv-09480    Document 1-1    Filed 11/13/25    Page 58 of 67

205.    The foregoing misrepresentations, partial misrepresentations and omissions have resulted in consumer injury or harm to the New York public.

206.    Plaintiffs and the Classes have been injured as a direct and proximate result of Defendant's violations of GBL § 350 as described above, as they would not have purchased the Infant Formulas, or would have paid significantly less for the Infant Formulas, had the misrepresentations, partial misrepresentations and omissions been properly disclosed and they had known the true nature of the Infant Formulas.

207.    Defendant's conduct is ongoing and continuing, such that prospective injunctive relief is necessary, especially given Plaintiffs' desire to purchase these Products in the future if they can be assured that the Infant Formulas are as advertised and do not contain Heavy Metals.

208.    As a result of Defendant's unlawful action, Plaintiffs and members of the Classes seek to enjoin Defendant's deceptive and unlawful acts and practices described herein and to recover actual damages or five hundred dollars, whichever is greater, as well as treble damages, reasonable attorneys' fees, and all other remedies this Court deems proper.

## COUNT III
### Fraud by Misrepresentation
### (*On Behalf of Plaintiffs and the Classes*)

209.    Plaintiffs incorporate by reference and reallege each and every allegation contained above, as though fully set forth herein.

210.    Defendant's Claims on the Products' packaging, which was purchased by Plaintiffs and members of the Classes, gave the impression that the Infant Formulas were of high quality and nutritious, information that is material to Plaintiffs and members of the Classes.

211.    The Claims by Defendant were false because the Infant Formulas contained or risked containing Heavy Metals.

212.    Defendant knew the Claims were false when Defendant made them because:

Case 1:25-cv-09480    Document 1-1    Filed 11/13/25    Page 59 of 67

(a)     Defendant was in a superior position to know the true state of facts about its Products;

(b)     Defendant was in a superior position to know the true nature of the ingredients, characteristics, and suitability of the Infant Formulas for consumption by infants with no development or health risks; and

(c)     Defendant knew that Plaintiffs and the Classes could not reasonably have been expected to learn about the presence or risk of Heavy Metals in the Products without Defendant disclosing it on the Infant Formulas' packaging.

213.    In addition, Defendant made the Claims recklessly and without regard for their truth because Defendant knew that properly and sufficiently monitoring for Heavy Metals in the Products and their ingredients was not only important, but also critical.

214.    Additionally, Defendant knew or should have been aware that a reasonable consumer would be feeding the Infant Formula multiple times each day to his or her baby, making it a significant source of food and nutrition for the child.  This leads to an infant's repeated exposure to Heavy Metals, which defeats the purpose of infant formula, *i.e.*, to nourish babies.

215.    Defendant intended that Plaintiffs and members of the Classes rely on the Claims because as an infant formula manufacturer, Defendant is in a special position of trust upon which consumers rely. Additionally, Defendant knew or should have known the Claims would induce Plaintiffs and the Class members to purchase the Infant Formulas.

216.    Plaintiffs and members of the Classes reasonably relied on the Claims because Defendant knows its customers trust the quality of its products and expect Defendant's Infant Formulas to be free of the risk or presence of Heavy Metals. Defendant also knows that consumers seek out and wish to purchase infant formulas that possess high quality ingredients free of toxins,

Case 1:25-cv-09480    Document 1-1    Filed 11/13/25    Page 60 of 67

contaminants, or chemicals, and that these consumers will pay for infant formulas that they believe possess these qualities.

217.    Plaintiffs and the Classes were harmed as a direct and proximate result of Defendant's conduct. Plaintiffs and the Classes suffered actual damages by: (1) paying a premium price for Products they reasonably believed were of high quality and nutritious and did not contain (or have a risk of containing) Heavy Metals; (2) purchasing Products they would not have purchased had the true quality and nutritiousness and the presence or risk of Heavy Metals in the Products been disclosed; and/or (3) receiving Products that were worthless because they contained or risked containing Heavy Metals.

218.    Plaintiffs' and members of the Classes' reliance on Defendant's representations was a substantial factor causing harm to the Plaintiffs and the Class members. The detriment is evident from the true quality, characteristics, and nature of the ingredients of the Products.

219.    Plaintiffs and the Classes seek actual damages, injunctive and declaratory relief, attorneys' fees, costs, and any other just and proper relief available under the laws.

**<u>COUNT IV</u>**
**Negligent Misrepresentation**
**(*On Behalf of Plaintiffs and the Classes*)**

220.    Plaintiffs incorporate by reference and reallege each and every allegation contained above, as though fully set forth herein.

221.    Defendant marketed the Products in a manner conveying to reasonable consumers that the Products do not contain (or risk containing) Heavy Metals.

222.    Defendant's Claims are material to a reasonable consumer because they relate to human health and food safety. Reasonable consumers would attach importance to such Claims and would be induced to act thereon in making purchasing decisions. Defendant intends that Plaintiffs

60

Case 1:25-cv-09480    Document 1-1    Filed 11/13/25    Page 61 of 67

and other consumers rely on the Claims, as evidenced by the intentional and conspicuous placement of the Claims on the labels.

223.    In selling the Products, Defendant acted in the ordinary course of its business and had pecuniary interest in Plaintiffs and other members of the Classes purchasing the Products.

224.    Defendant owed a duty of care to Plaintiffs and the Class members to not provide them with false or incomplete information when they were making their purchasing decisions regarding the Products.

225.    Defendant knew or had been negligent in not knowing that the Products contained or risked containing toxic Heavy Metals. Defendant had no reasonable grounds for believing the Claims were not false and misleading.

226.    Defendant negligently marketed that the Products did not contain or risk containing Heavy Metals based on the Claims.

227.    Plaintiffs and Class members reasonably and justifiably relied on the Claims when purchasing the Products and, had the correct facts been known, would not have purchased the Products at the prices at which they were offered (or at all).

228.    Therefore, as a direct and proximate result of Defendant's negligent misrepresentations, Plaintiffs and other members of the Classes have suffered economic losses and other general and specific damages, in the amount of the Products' purchase prices, or some portion thereof, and any interest that would have accrued on those monies, all in an amount to be proven at trial.

Case 1:25-cv-09480     Document 1-1     Filed 11/13/25     Page 62 of 67

## COUNT V
### Unjust Enrichment
#### (*On Behalf of Plaintiffs and the Classes*)

229.    Plaintiffs incorporate by reference and reallege each and every allegation contained above, as though fully set forth herein.

230.    Defendant's financial benefits resulting from its unlawful and inequitable conduct are economically traceable to Plaintiffs' and the members of the Classes' purchases of the Products, and the economic benefits conferred on Defendant are a direct and proximate result of its unlawful and inequitable conduct.

231.    It would be inequitable, unconscionable, and unjust for Defendant to be permitted to retain these economic benefits because the benefits were procured as a direct and proximate result of its wrongful conduct.

232.    As a result, Plaintiffs and members of the Classes are entitled to equitable relief including restitution and/or disgorgement of all revenues, earnings, profits, compensation and benefits which may have been obtained by Defendant as a result of such business practices.

## COUNT VI
### Breach of the Implied Warranty of Merchantability
### New York Uniform Commercial Code § 2-314
#### (*On Behalf of Plaintiffs and the Classes*)

233.    Plaintiffs incorporate by reference and reallege each and every allegation contained above, as though fully set forth herein.

234.    This claim is brought by Plaintiffs on behalf of themselves and the Classes.

235.    New York U.C.C. § 2-314 provides that "a warranty that the goods shall be merchantable is implied in a contract for their sale if the seller is a merchant with respect to goods of that kind." New York U.C.C. § 2-314(1).

Case 1:25-cv-09480    Document 1-1    Filed 11/13/25    Page 63 of 67

236.    New York U.C.C. § 2-314(2) provides that "[g]oods to be merchantable must be at least such as . . . (c) are fit for the ordinary purposes for which the goods are used; and … (f) conform to the promises or affirmations of fact made on the container or label if any[.]" New York U.C.C. § 2-314(2)(c) & (f).

237.    Defendant is a merchant with respect to the sale of the Infant Formulas.  Therefore, a warranty of merchantability is implied in every contract for sale of the Infant Formulas to New York consumers.

238.    At all times mentioned herein, Defendant manufactured and sold the Infant Formulas and, prior to the time the Infant Formulas were purchased by Plaintiffs and the Classes, impliedly warranted that the Infant Formulas were of merchantable quality and fit for their ordinary use (consumption by infants with no development or health risks).

239.    Plaintiffs and the Classes relied on these implied warranties when they purchased the Infant Formulas.

240.    The Infant Formulas were not fit for their ordinary use (the nourishment  and consumption by infants with no development or health risks) as they contained (or risked containing) Heavy Metals that do not conform to the packaging.

241.    These promises became part of the basis of the bargain between Defendant and Plaintiffs and members of the Classes, and thus constituted implied warranties.

242.    Defendant breached the implied warranties by selling Infant Formulas that contain (or risk containing) Heavy Metals.

243.    Defendant was on notice of this breach as it was aware of the inclusion (or risk) of Heavy Metals.

Case 1:25-cv-09480    Document 1-1    Filed 11/13/25    Page 64 of 67

244.    Privity exists because Defendant impliedly warranted to Plaintiffs and the members of the Classes through the Products' packaging that the Infant Formulas were healthy, nutritious, and safe for consumption; however, Defendant failed to mention or disclose the Infant Formulas contained (or risked containing) Heavy Metals.

245.    Plaintiffs, on behalf of themselves and members of the Classes, seek actual damages for Defendant's failure to deliver goods that conform to their implied warranties and resulting breach.

246.    Plaintiffs and the members of the Classes purchased the Products manufactured and marketed by Defendant by and through Defendant's authorized sellers for retail or online sale to consumers. At all relevant times, Defendant was the merchant, manufacturer, marketer, warrantor, and/or seller of the Products. Defendant knew or had reason to know of the specific use for which its Products were purchased.

247.    The Products when sold at all times thereafter were not in merchantable condition and did not conform to the promises on the packaging. The Products are not safe for babies based on accumulation of Heavy Metals. Thus, Defendant breached its implied warranty of merchantability for the ordinary purpose for which the Products are purchased and used.

248.    Defendant cannot disclaim its implied warranty as it knowingly sold Products that contained (or risked containing) Heavy Metals.

249.    Defendant was provided notice as described above by its membership with INCA (e.g., through INCA's lobbying efforts in opposition to AB 899). Affording any further opportunity to cure its breach of implied warranties would be unnecessary and futile here because Defendant has known of and concealed the safety risks attendant to the Infant Formulas.

Case 1:25-cv-09480    Document 1-1    Filed 11/13/25    Page 65 of 67

250.    On June 25, 2025, within a reasonable time of discovering the Heavy Metal issue, Plaintiff Choudhry sent Defendant a letter on behalf of herself and all other United States citizens, including the members of the Classes, who purchased the Infant Formulas notifying Defendant of its breaches of warranty and demanding that Defendant rectify the problems stated herein. Defendant has failed to rectify or agree to rectify the problems associated with the actions detailed above.

251.    As a direct and proximate result of Defendant's breach of the implied warranty of merchantability, Plaintiffs and members of the Classes have suffered damages in an amount to be proven at trial by: (1) paying a premium price for Products they reasonably believed did not contain (or risk of containing) Heavy Metals; (2) purchasing Products they would not have purchased had Defendant's misrepresentations, partial misrepresentations and omissions been disclosed; and/or (3) receiving Products that were worthless because they contained or risked containing heavy metals.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs, individually and on behalf of all others similarly situated, pray for judgment against the Defendant as to each and every count, including:

A.    An order declaring this action to be a proper class action, appointing Plaintiffs and their counsel to represent the Classes, and requiring Defendant to bear the costs of class notice;

B.    An order enjoining Defendant from selling the Infant Formulas until the presence or risk of Heavy Metals are disclosed;

C.    An order enjoining Defendant from selling the Infant Formulas in any manner suggesting or implying that they are of a certain quality and made from nutritious ingredients unless the Products have non-detectable levels of Heavy Metals;

D.      An order requiring Defendant to engage in a corrective advertising campaign and engage in any further necessary affirmative injunctive relief;

E.      An order awarding declaratory relief, and any further injunctive relief permitted by law or equity, including enjoining Defendant from continuing the unlawful practices alleged herein, and injunctive relief to remedy Defendant's conduct;

F.      An order requiring Defendant to pay restitution to restore all funds acquired by means of any act or practice declared by this Court to be an unlawful, unfair, or fraudulent business act or practice, untrue or misleading advertising, or a violation of the state laws, plus pre- and post-judgment interest thereon;

G.      An order requiring Defendant to disgorge or return all monies, revenues, and profits obtained by means of any wrongful or unlawful act or practice;

H.      An order requiring Defendant to pay all actual and statutory damages permitted under the counts alleged herein;

I.      An order requiring Defendant to pay punitive damages on any count so allowable;

J.      An order awarding attorneys' fees and costs to Plaintiffs and members of the Classes; and

K.      An order providing for all other such equitable relief as may be just and proper.

<u>JURY DEMAND</u>

Pursuant to Section 4101 of the New York Civil Practice Law and Rules, Plaintiffs hereby demand a trial by jury on all issues so triable.

Dated: October 9, 2025

By: _Janine L. Pollack_

Janine L. Pollack
Lori G. Feldman
**GEORGE FELDMAN MCDONALD, PLLC**
745 Fifth Avenue, Suite 500
New York, New York 10151
Phone: (917) 983-2707
Facsimile: (888) 421-4173
Email: jpollack@4-justice.com
Email: lfeldman@4-justice.com
E-Service: eservice@4-justice.com

Rebecca A. Peterson
**GEORGE FELDMAN MCDONALD, PLLC**
1650 West 82nd Avenue, Suite 880
Bloomington, MN 55431
Phone: (612) 778-9595
Facsimile: (888) 421-4173
Email: rapeterson@4-justice.com
E-Service: eservice@4-justice.com

Innessa M. Huot
**FARUQI & FARUQI, LLP**
685 Third Avenue, 26th Floor
New York, NY 10017
Phone: (212) 983-9330
Facsimile: (212) 983-9331
Email: ihuot@faruqilaw.com

Kara A. Elgersma
**WEXLER BOLEY & ELGERSMA LLP**
311 S. Wacker Drive
Suite 5450
Chicago, IL 60606
Phone : (312) 346-2222
Facsimile : (312) 346-0022
E-mail : kae@wbe-llp.com

_**Counsel for Plaintiffs and the Putative Classes**_

67