UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

MOONA CHOUDHRY *and* KAMAL HARRY, *on behalf of themselves and all others similarly situated*,

Plaintiffs,

*– against –*

MEAD JOHNSON & COMPANY, LLC,

Defendant.

**OPINION & ORDER**

25-cv-09480 (ER)

RAMOS, D.J.:

Moona Choudhry and Kamal Harry, on behalf of themselves and all others similarly situated, bring suit against Mead Johnson & Company, LLC ("Mead Johnson") pursuant to NY Civil Practice Law and Rules § 901, et. seq.[1] Before the Court is a motion to dismiss the amended complaint pursuant to Federal Rules of Civil Procedure 12(b)(1) and 12(b)(6). For reasons set forth below, the motion to dismiss is GRANTED in part and DENIED in part.

## I. BACKGROUND

### A. Factual Background[2]

Plaintiffs bring this putative class action on behalf of all persons who purchased the infant formulas Enfamil A.R., Enfamil Gentlease, Enfamil Enspire/Optimum Gentlease, Enfamil NeuroPro, Enfamil NeuroPro Sensitive, Enfamil Nutramigen, Enfamil ProSobee, PurAmino Hypoallergenic (the "Infant Formulas") in New York.[3] Doc. 1-1 ¶ 175. Plaintiffs allege that testing conducted on these products reveal that they

---

[1] NY Civil Practice Law and Rules §§ 901–09 sets forth the rules governing class action lawsuits in New York.

[2] The background is drawn from factual allegations in the amended complaint, *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009), documents attached to the complaint as exhibits, and documents incorporated by reference therein, *DiFolco v. MSNBC Cable L.L.C.*, 622 F.3d 104, 111 (2d Cir. 2010). The Court accepts all well-pleaded factual allegations as true. *Id.*

[3] Plaintiffs divide the class into eight subclasses based on the products they purchased. Doc. 1-1 ¶ 175.

contain arsenic, cadmium, and lead ("Heavy Metals").[4] *Id.* ¶¶ 64–66. Heavy Metals present significant health risks, particularly to young children, and according to a 2021 report by a U.S. House of Representatives' Subcommittee, "can cause serious and often irreversible damage to brain development," including from "low levels of exposure." *Id.* ¶ 15.

Choudhry is an individual consumer and resident of New York County. *Id.* ¶ 31. Harry is an individual consumer and resident of Queens County. *Id.* ¶ 36. They purchased the Infant Formulas, including Enfamil Nutramigen, for their children. *Id.* ¶¶ 31–32, 36–37. Mead Johnson, the manufacturer of the Infant Formulas, is a Delaware corporation with its headquarters located in Evansville, Indiana, and it is a subsidiary of Reckitt Benckiser Group PLC, whose U.S. headquarters is in Parsippany, New Jersey. *Id.* ¶ 41.

Choudhry purchased the Formula between January and March 2025, *id.* ¶ 32, and Harry did so between December 2022 and June 2023, *id.* ¶ 37. Choudhry and Harry, relying on the packaging of the Infant Formulas, believed it was nutritious and high quality. *Id.* ¶¶ 33, 38. Specifically, when purchasing the Infant Formulas, Plaintiffs relied on the following claims on the packaging: "'Brain Building,' '#1 Recommended Brand by Pediatricians,' 'The Only Hypoallergic [sic] Formula With LGG® Probiotic,' 'No Artificial Growth Hormones,' 'LGG® probiotic to help support digestive health' and 'does not use table sugar.'" *Id.* Other claims that appear on multiple products include assertions that the product is "expert recommended," "for Sensitive Tummies," supports "Immune Health," and contains various vitamins. *Id.* ¶ 49. Plaintiffs allege that they

---

[4] Plaintiffs' counsel's testing revealed that: Enfamil A.R. contained 3.4 ppb of arsenic, 3.2 ppb of cadmium, and 1.2 ppb of lead. Enfamil Gentlease contained 3.7 ppb of arsenic, 2.6 ppb of cadmium, and 1.7 ppb of lead. Enfamil Enspire/Optimum Gentlease contained 5.0 ppb of arsenic, 2.3 ppb of cadmium, and less than 1.0 ppb of lead. Enfamil NeuroPro contained less than 2.2 ppb of arsenic, 2.0 ppb of cadmium, and less than 1.0 ppb of lead. Enfamil NeuroPro Sensitive contained 5.1 ppb of arsenic, less than 1.3 ppb of cadmium, and 2.3 ppb of lead. Enfamil Nutramigen contained 7.9 ppb of arsenic, 4.6 ppb of cadmium, and 6.5 ppb of lead. Enfamil ProSobee contained 6.7 ppb of arsenic, 6.8 ppb of cadmium, and 3.5 ppb of lead. Doc. 1-1 ¶ 64.

were unaware that the Infant Formulas contained, or risked containing, Heavy Metals and that they would not have purchased the Infant Formulas had this information been disclosed. *Id.* ¶¶ 34, 39. Choudhry and Harry allege that they paid a price premium for the Infant Formulas based on the reasonable assumption that the packaging was accurate and the product free from Heavy Metals. *Id.* ¶¶ 35, 40.

Plaintiffs allege that Mead Johnson's marketing conveys to consumers that its products are healthy, nutritious, and fails to disclose that the Infant Formulas contain or risk containing Heavy Metals. *Id.* ¶¶ 7, 48. Plaintiffs allege that the packaging of these products contains misrepresentations, partial misrepresentations, and omissions. *Id.* ¶ 189.

Mead Johnson's website provided further claims about the health of the products. *Id.* ¶ 10.[5] Plaintiffs allege that consumers consider the quality, nutritional value, and presence of Heavy Metals to be material to their purchasing decisions, *id.* ¶ 115, and that Mead Johnson knew or should have known about the health risks that Heavy Metals pose to infants, *id.* ¶ 67. Plaintiffs also allege that Mead Johnson had superior knowledge about the health qualities of the Infant Formulas, including whether it had contained or risked containing Heavy Metals. *Id.* ¶ 59. Plaintiffs allege that Mead Johnson was capable of producing Infant Formulas without detectable levels of Heavy Metals, *id.* ¶ 131, and supports this claim by referencing testing conducted on other infant formulas which did not contain detectable levels of Heavy Metals, *id.* ¶¶ 125–130. Plaintiffs also

---

[5] Although Plaintiffs do not contend that they relied on the claims on Mead Johnson's website, those claims include: (1) "health and safety of infants and children is [Mead Johnson's] top priority," (2) Mead Johnson is "committed to providing [] high quality and safe products for [its] littlest consumers," (3) Mead Johnson's "products undergo extensive quality and safety checks throughout the manufacturing process—from raw materials to finished product," (4) "samples from every batch [it] produce[s] are tested to ensure the product meets [its] stringent quality standards;" and (5) "[p]arents can be assured that [its] infant formulas are safe and nutritious feeding options for their infants." Doc. 1-1 ¶ 10. The website also represented the products "meet or exceed all infant formula requirements set out by the FDA," that its "manufacturing facilities adhere[] to safety guidelines among the most rigorous in the food industry and [its] own stringent quality standards," its "infant products undergo extensive quality and safety checks," and, among other statements, that Mead Johnson is "committed to the most stringent manufacturing, packaging, and quality assurance procedures." *Id.* ¶ 110.

allege that Mead Johnson knowingly did not follow manufacturing and testing standards, *id.* ¶ 154, and, as a member of the Infant Nutrition Council of America ("INCA"), lobbied against a California bill which would have required infant formula manufacturers to test for and disclose the levels of Heavy Metals in its products, *id.* ¶ 113. Plaintiffs allege that consumers reasonably expected Mead Johnson to test for Heavy Metals and disclose that information to the public, *id.* ¶ 139, and that Mead Johnson deceptively hid that it failed to monitor the presence of Heavy Metals in its products, *id.* ¶ 132.

Plaintiffs assert that a reasonable consumer would not expect the Infant Formulas to contain Heavy Metals. *Id.* ¶ 144. In support of this contention, Plaintiffs cite a consumer survey conducted by their counsel, which found that 77.8% of survey participants answered "No" when asked, "After seeing the label would you expect arsenic, cadmium, lead, and/or mercury in the infant formula?" *Id.* ¶ 147. The survey followed up, asking participants, "how important, if at all, would it be to your purchasing decision if the infant formula you purchased contained, or risked containing, even a small amount of arsenic, cadmium, lead, and/or mercury," and 71.0% of participants answered "Very important," 25.4% "Important," and 3.6% "Not at all important." *Id.*

Also, because Mead Johnson has so requested, the Court takes judicial notice of the FDA's "Closer to Zero" initiative and Operation Stork Speed. *See Sekisui America Corp. v. Hart*, 15 F. Supp. 3d 359, 363 n.20 (S.D.N.Y. 2014) ("The Court takes judicial notice of . . . widely available FDA publications because the facts therein are 'not subject to reasonable dispute' and 'can be accurately and readily determined from sources whose accuracy cannot reasonably be questioned.'" (quoting Fed. R. Evid. 201(b)(2))); *Ningbo Products Import & Export Co. v. Eliau*, No. 11 Civ. 650 (PKC), 2011 WL 5142756, at *4 (S.D.N.Y. Oct. 31, 2011) ("[T]his Court may consider matters of public record for which it [may] take judicial notice." (citing *Brass v. American Film Technologies, Inc.*, 987 F.2d 142, 150 (2d Cir. 1993))). The FDA began the "Closer to Zero" initiative to reduce exposure to contaminants in foods, prioritizing foods commonly consumed by infants and

young children. *Closer to Zero: Reducing Childhood Exposure to Contaminants from Foods* (January 6, 2025), F.D.A., https://www.fda.gov/food/environmental-contaminants-food/closer-zero-reducing-childhood-exposure-contaminants-foods. In Operation Stork Speed, the FDA conducted a comprehensive review of infant formula and increased testing for contaminants with the goal of providing guidance on the safe levels of Heavy Metals in infant formula. *Operation Stork Speed*, F.D.A., https://www.fda.gov/food/infant-formula-homepage/operation-stork-speed (last visited Aug. 5, 2026). In April 2026, the FDA released a report finding low levels of Heavy Metals in many infant formulas, cautioned that this was not automatically reason for alarm, and that additional guidance is forthcoming, but did not provide a timeline for that guidance. *Id.*

**B. Procedural Background**

Plaintiffs filed their original complaint in the Supreme Court of the State of New York, County of New York on October 9, 2025. Doc. 1-1. Mead Johnson removed the action to this Court on November 13, 2025, pursuant to the Class Action Fairness Act of 2005, 28 U.S.C. § 1332(d). Doc. 1. Mead Johnson then filed a motion to dismiss pursuant to Federal Rules of Civil Procedure 12(b)(1) and 12(b)(6) on December 22, 2025. Doc. 21. Mead Johnson first argues that the Court should invoke primary jurisdiction and defer to the FDA to set the appropriate levels of Heavy Metals in infant formula. They then argue that Plaintiffs lack Article III standing to sue for products they did not purchase and also lack standing to sue for injunctive relief. Mead Johnson also contends that Plaintiffs fail to sufficiently allege their New York General Business Law (“GBL”), fraudulent misrepresentation, negligent misrepresentation, and implied

warranty claims. Lastly, Mead Johnson argues that Plaintiffs' unjust enrichment claim should be dismissed as duplicative. Doc. 22.[6]

## II. LEGAL STANDARDS

### A. Rule 12(b)(1)

Pursuant to Rule 12(b)(1), the Court must dismiss a case for lack of subject matter jurisdiction if the Court "lacks the statutory or constitutional power to adjudicate it." *Makarova v. United States*, 201 F.3d 110, 113 (2d Cir. 2000) (citing Fed. R. Civ. P. 12(b)(1)); *see also United States v. Bond*, 762 F.3d 255, 263 (2d Cir. 2014) (describing subject-matter jurisdiction as a "threshold question"). "A plaintiff asserting subject matter jurisdiction has the burden of proving by a preponderance of the evidence that it exists." *Makarova*, 201 F.3d at 113.

"In the absence of standing, a court lacks the requisite subject matter jurisdiction over the case." *HealthNow New York Inc. v. New York*, 448 F. App'x 79, 81 (2d Cir. 2011) (citing *S. Jackson & Son, Inc. v. Coffee, Sugar & Cocoa Exchange, Inc.,* 24 F.3d 427, 431 (2d Cir.1994)). When "standing is challenged on the basis of the pleadings, [the Court] accept[s] as true all material allegations of the complaint, and must construe the complaint in favor of the [plaintiff]." *Connecticut v. Physicians Health Services of Connecticut, Inc.*, 287 F.3d 110, 114 (2d Cir. 2002) (internal quotation marks omitted). However, the burden remains on the plaintiff, as the party invoking federal jurisdiction, to establish its standing as the proper party to bring an action. *Selevan v. New York Thruway Authority*, 584 F.3d 82, 89 (2d Cir. 2009); *see also FW/PBS, Inc. v. City of Dallas*, 493 U.S. 215, 231 (1990) ("It is a long-settled principle that standing cannot be inferred argumentatively from averments in the pleadings, but rather must affirmatively appear in the record," and it is the burden of the plaintiff "clearly to allege facts demonstrating that

---

[6] The parties have also filed three notices of supplemental authority concerning similar cases, two of which are in other districts, and one that is in the same district as this action. Docs. 30–32. Mead Johnson has also filed a notice of supplemental authority concerning updates in Operation Stork Speed. Doc. 33.

he is a proper party to invoke judicial resolution of the dispute.") (internal quotation marks omitted). In resolving a motion to dismiss for lack of subject matter jurisdiction pursuant to Rule 12(b)(1), a district court may consider evidence outside the pleadings. *Morrison v. National Australia Bank Ltd.*, 547 F.3d 167, 170 (2d Cir. 2008), *aff'd*, 561 U.S. 247 (2010) (citing *Makarova*, 201 F.3d at 113).

Where, as here, a party also seeks dismissal on Rule 12(b)(6) grounds, the Court must consider the Rule 12(b)(1) motion first, *Baldessarre v. Monroe-Woodbury Central School District*, 820 F. Supp. 2d 490, 499 (S.D.N.Y. 2011), *aff'd*, 496 F App'x 131 (2d Cir. 2012), because "disposition of a Rule 12(b)(6) motion is a decision on the merits, and therefore, an exercise of jurisdiction," *Chambers v. Wright*, No. 05 Civ. 9915 (WHP), 2007 WL 4462181, at *2 (S.D.N.Y. Dec. 19, 2007) (quoting *Magee v. Nassau County Medical Center*, 27 F Supp. 2d 154, 158 (E.D.N.Y. 1998)).

**B. Rule 12(b)(6)**

To survive a motion to dismiss pursuant to Rule 12(b)(6), "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). A claim is facially plausible "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* (citing *Twombly*, 550 U.S. at 556). The plaintiff must allege sufficient facts to show "more than a sheer possibility that a defendant has acted unlawfully." *Id.* (citing *Twombly*, 550 U.S. at 556). "[A] complaint . . . does not need detailed factual allegations" to survive a motion to dismiss. *Twombly*, 550 U.S. at 555.

The question on a motion to dismiss "is not whether a plaintiff will ultimately prevail but whether the claimant is entitled to offer evidence to support the claims." *Sikhs for Justice v. Nath*, 893 F. Supp. 2d 598, 615 (S.D.N.Y 2012) (quoting *Villager Pond, Inc. v. Town of Darien*, 56 F.3d 375, 378 (2d Cir. 1995)). Indeed, "the purpose of Federal

Rule of Civil Procedure 12(b)(6) is to test, in a streamlined fashion, the formal sufficiency of the plaintiff's statement of a claim for relief without resolving a contest regarding its substantive merits" or "weigh[ing] the evidence that might be offered to support it." *Halebian v. Berv*, 644 F.3d 122, 130 (2d Cir. 2011) (internal quotation marks omitted) (quoting *Global Network Communications, Inc. v. City of New York*, 458 F.3d 150, 155 (2d Cir. 2006). Thus, when ruling on a motion to dismiss pursuant to Rule 12(b)(6), the Court accepts all factual allegations in the complaint as true and draws all reasonable inferences in the plaintiff's favor. *Nielsen v. Rabin*, 746 F.3d 58, 62 (2d Cir. 2014).

## III. DISCUSSION[7]

### A. Subject Matter Jurisdiction

#### *1. The Primary Jurisdiction Doctrine*[8]

Mead Johnson argues that the case should be dismissed pursuant to the doctrine of primary jurisdiction because Plaintiffs' claims of misleading labeling are premised upon a decision about what level of heavy metals are acceptable in infant formula, a decision that the FDA is better equipped to make. Doc. 22 at 12–14. In a notice of supplemental authority, alerting the court to updates in Operation Stork Speed, Mead Johnson further argues that the invocation of the primary jurisdiction doctrine is proper here because the FDA has released extensive testing on the level of Heavy Metals in infant formulas. Doc.

[7] Following Mead Johnson's motion to dismiss, Plaintiffs chose not to pursue their claims for negligent misrepresentation and breach of the implied warranty of merchantability, as well as their claims for injunctive relief, reserving their right to seek remand of the injunctive claims in state court. Doc. 23 at 7 n.2.

[8] "The doctrine of primary jurisdiction is concerned with 'promoting proper relationships between the courts and administrative agencies charged with particular regulatory duties.'" *Ellis v. Tribune Television Co.*, 443 F.3d 71, 81 (2d Cir. 2006) (quoting *United States v. Western Pacific Railroad Co.,* 352 U.S. 59, 63 (1956). It is an abstention doctrine that applies when a court has jurisdiction over a claim, "but enforcement of the claim requires, or is materially aided by, the resolution of threshold issues . . . placed within the special competence of the administrative body." *Golden Hill Paugussett Tribe of Indians v. Weicker*, 39 F.3d 51, 58–59 (2d Cir. 1994). The doctrine "serves two interests: consistency and uniformity in the regulation of an area which Congress has entrusted to a federal agency; and the resolution of technical questions of facts through the agency's specialized expertise, prior to judicial consideration of the legal claims." *Id.* at 59.

33 at 1–2. Specifically, the FDA explicitly stated that trace levels of Heavy Metals do not automatically render the formulas unsafe. *Id.* Accordingly, Mead Johnson contends that the Court should wait for the FDA to provide its anticipated guidance before ruling on this case. *Id.*

Plaintiffs argue the case should not be dismissed pursuant to the primary jurisdiction doctrine because the issue before the Court is not what level of Heavy Metals are permissible in infant formula, but rather whether Mead Johnson's advertisements were deceptive. Doc. 23 at 12–15. With respect to the supplemental authority, Plaintiffs argue (1) that the results of Operation Stork Speed cannot be considered because they are outside the complaint, (2) the results do not support dismissal because it bolsters the contention that the Infant Formulas contain Heavy Metals and leaves open the question of whether this is material to reasonable consumers, and (3) the full press release from the FDA supports the notion that the presence of Heavy Metals is material and manufacturers should disclose that information. Doc. 34 at 1. Plaintiffs further argue that the instant action focuses on deceptive labeling concerning whether the Infant Formulas contain or risk containing Heavy Metals, so even if the FDA were to provide guidance, for which there is still no clear timeline, the pertinent question would remain unanswered. *Id.* at 2.

There is no "fixed formula" for the application of the primary jurisdiction doctrine, which should be applied on a case by case basis. *Ellis*, 443 F.3d at 82 (citations omitted). However, courts in the Second Circuit have focused their inquiry on the balancing of four factors:

> (1) whether the question at issue is within the conventional experience of judges or whether it involves technical or policy considerations within the agency's particular field of expertise; (2) whether the question at issue is particularly within the agency's discretion; (3) whether there exists a substantial danger of inconsistent rulings; and (4) whether a prior application to the agency has been made.

*Id.* at 82–83 (2d Cir. 2006) (citing *National Communications Association, Inc. v. American Telephone & Telegraph Co.*, 46 F.3d 220, 222 (2d Cir. 1995) (the "*Ellis*

factors"). "[T]he court must also balance the advantages of applying the doctrine against the potential costs resulting from complications and delay in the administrative proceedings." *Id.* at 83 (quoting *National Communications*, 46 F.3d at 223).

The doctrine of primary jurisdiction is intended to be a "relatively narrow exception" to the courts' duty "to exercise the jurisdiction given them." *White v. Beech-Nut Nutrition Co.*, No. 23 Civ. 220, 2024 WL 194699, at *1 (2d Cir. Jan. 18, 2024) (internal quotations omitted). In *Beech-Nut*, the Second Circuit vacated the district court's dismissal of the case based on the primary jurisdiction doctrine. *Id.* *Beech-Nut* similarly also dealt with claims that a baby food manufacturer's products contained elevated levels of certain toxic metals. *Id.* The Second Circuit explicitly considered the FDA's "Closer to Zero" initiative but found it unnecessary to weigh the *Ellis* factors because the FDA had no expected timeline to provide actionable guidance on the safe levels of Heavy Metals in infant formulas, which outweighed "any advantages of deferring to the FDA under the primary jurisdiction doctrine." *Id.* at *2.

Mead Johnson contends that the Court should defer to the FDA, distinguishing *Beech-Nut* because of the FDA's Operation Stork Speed, which detailed the levels of Heavy Metals in various infant formulas. Doc. 22 at 13–14. However, as Plaintiffs note, the FDA still has not provided a clear timeline for when they plan to provide the comprehensive guidance.[9] While Operation Stork Speed states that the "detection of a contaminant does not automatically mean a product is unsafe," it does not provide a timeline for actionable guidance on safe levels of Heavy Metals in infant formula. Food and Drug Administration, *FDA's Infant Formula Product Testing Results* (April 29,

---

[9] Mead Johnson also points to updates in the FDA's "Closer to Zero" Initiative, which provided guidance on lead levels in food intended for babies and young children after the *Beech-Nut* decision. Doc. 22 at 13. However, this does not persuade the Court to distinguish *Beech-Nut* for two reasons: (1) it focuses on "foods commonly eaten by babies and young children" rather than infant formula, and (2) it does not have a clear timeline for when guidance will be published for arsenic, cadmium, and mercury. *Closer to Zero: Reducing Childhood Exposure to Contaminants from Foods* (January 6, 2025), F.D.A., https://www.fda.gov/food/environmental-contaminants-food/closer-zero-reducing-childhood-exposure-contaminants-foods.

2026), https://www.fda.gov/food/infant-formula-homepage/fdas-infant-formula-product-testing-results. While the FDA is working on providing this guidance, the reasoning of *Beech-Nut* counsels that the Court should not defer to the agency when there is no clear timeline for when guidance will be announced. *Beech-Nut*, 2024 WL 194699, at *2.

Also, courts in analogous cases across the country have consistently declined to apply the primary jurisdiction doctrine because the courts are well-suited to determine if a product's packaging was misleading or deceptive. *See Raya v. Mead Johnson Nutrition Co.*, 758 F. Supp. 3d 819, 830 (N.D. Ill. 2024) (holding that the court does not require FDA guidance to determine whether the packaging of Infant Formula is misleading); *Lopez v. Mead Johnson Nutrition Co.*, No. 24 Civ. 03573 (HSG), 2026 WL 788492, at *3 (N.D. Cal. Mar. 20, 2026) (same); *Seutter v. Mead Johnson Nutrition Co.*, 763 F. Supp. 3d 783, 791 (D. Minn. 2025) (declining to invoke the primary jurisdiction doctrine and considering the fact that the FDA's "Closer to Zero" initiative does not intend to provide guidance on infant formula); *see also Palmer v. Amazon.com, Inc.*, 51 F.4th 491, 507 (2d Cir. 2022) (declining to apply primary jurisdiction because "the issues before [the court were] tort-based claims . . . that are within the conventional experience of judges"). When a case is "'less about science than it is about whether a label is misleading,' . . . [it] is one to which courts are eminently well suited, even well versed [to decide]." *In re Frito-Lay North America, Inc. All Natural Litigation*, No. 12-MD-2413 (RRM) (RLM), 2013 WL 4647512, at *8 (E.D.N.Y. Aug. 29, 2013) (quoting *Jones v. ConAgra Foods, Inc.,* 912 F.Supp.2d 889, 898 (N.D.Cal.2012)).

Following this authority, the *Ellis* factors do not support invoking primary jurisdiction in this case. Deciding whether the packaging on the Infant Formulas is misleading is "within the conventional experience of judges," and that question is not "particularly within the agency's discretion." *Ellis*, 443 F.3d at 82–83. Contrary to Mead Johnson's assertions, this case does not require the Court to determine what levels of Heavy Metals should be permissible, so there is not "a substantial danger of inconsistent

rulings." *Id.* Also, while Mead Johnson notes its concern about district courts providing inconsistent rulings, this factor is primarily "concerned with inconsistent rulings between courts and agencies, not between different courts." *Hasemann v. Gerber Products Co.*, No. 15 Civ. 2995 (MKB), 2016 WL 5477595, at *7 (E.D.N.Y. Sept. 28, 2016) (citing *Ellis*, 443 F.3d at 87–88).

Therefore, the Court declines to apply the primary jurisdiction doctrine and determines that it can adjudicate this dispute.

*2. Standing for Products Plaintiffs Did Not Purchase*

Mead Johnson does not dispute that Choudhry and Harry have standing to sue for the one product they claim to have purchased, Enfamil Nutramigen. Doc. 22 at 14. However, Mead Johnson contends that Plaintiffs lack Article III standing for the products they did not purchase because they cannot show they have been personally injured. Doc. 22 at 15–16. Mead Johnson argues that the Infant Formulas have different ingredients and require unique evidence to establish that they were misleading, thus, not raising the "same set of concerns." *Id.* at 16–18. Plaintiffs, however, state that courts should decide the question of standing on a Rule 23 class certification motion rather than a motion to dismiss for lack of subject-matter jurisdiction. Doc. 23 at 16–17. Nonetheless, Plaintiffs contend that they do have standing for the Infant Formulas they did not purchase because those products are "substantially similar" to and implicate the "same set of concerns" as the Infant Formula that they did purchase. *Id.* at 17–19.

To establish standing pursuant to Article III of the Constitution, a plaintiff must show "(1) that he or she suffered an injury in fact that is concrete, particularized, and actual or imminent, (2) that the injury was caused by the defendant, and (3) that the injury would likely be redressed by the requested judicial relief." *Thole v. U.S. Bank N.A.*, 590

U.S. 538, 540 (2020) (citing *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560–61 (1992)).

To establish class standing, a plaintiff must show that (1) "he 'personally has suffered some actual . . . injury as a result of the putatively illegal conduct of the defendant,' and (2) . . . such conduct implicates 'the same set of concerns' as the conduct alleged to have caused injury to other members of the putative class by the same defendants." *Buonasera v. Honest Co., Inc.*, 208 F. Supp. 3d 555, 563 (S.D.N.Y. 2016) (quoting *NECA–IBEW Health & Welfare Fund v. Goldman Sachs & Co.*, 693 F.3d 145, 162 (2d Cir. 2012) (internal citations omitted)).

District courts are split on whether a plaintiff may, consistent with Article III, maintain a putative class action over products that he or she did not purchase. *Kacocha v. Nestle Purina Petcare Co.*, No. 15 Civ. 5489 (KMK), 2016 WL 4367991, at *10 (S.D.N.Y. Aug. 12, 2016) (collecting cases). However, courts have coalesced around the notion that the "better view" is that "subject to further inquiry at the class certification stage, a named plaintiff has standing to bring class action claims . . . for products that he did not purchase, so long as those products, and the false or deceptive manner in which they were marketed, are sufficiently similar" to the purchased products. *Bautista v. CytoSport, Inc.*, 223 F. Supp. 3d 182, 188 (S.D.N.Y. 2016) (quoting *Mosely v. Vitalize Labs, LLC*, No. 13 Civ. 2470 (RJD), 2015 WL 5022635, at *7 (E.D.N.Y. Aug. 24, 2015)). At the pleading stage, district courts have upheld putative class action claims for products the plaintiffs did not purchase when (1) "the products are substantially similar to the products that they did purchase," and (2) "the alleged misrepresentation is the

same." *Rivera v. S.C. Johnson & Son, Inc.*, No. 20 Civ. 3588 (RA), 2021 WL 4392300, at *9 (S.D.N.Y. Sept. 24, 2021) (collecting cases).

Mead Johnson, relying on *DiMuro v. Clinique Laboratories, LLC*, 572 F. App'x 27 (2d Cir. 2014), contends that this is not a case in which the unpurchased products implicate the "same set of concerns." Doc. 22 at 16–18. In *DiMuro*, plaintiffs brought class action false advertising claims arising from the defendants' marketing of a line of cosmetics products. *DiMuro*, 572 F. App'x at 29. Their claims included seven different products, only three of which were purchased by the plaintiffs. *Id.* The Second Circuit affirmed the district court's holding that the plaintiffs lacked standing to assert claims for the unpurchased products because those products had different ingredients and each one had different advertising claims. *Id.* Because the products made unique claims, unique evidence would thus be required to prove the falsity of each allegedly misleading advertising claim. *Id.*

Although the products here do not all contain identical ingredients, district courts have routinely distinguished *DiMuro* when the same alleged misrepresentation is present on both the purchased and unpurchased products, as Plaintiffs allege here. *See Buonasera*, 208 F. Supp. 3d at 563 ("Although the unpurchased products may contain different ingredients compared to the purchased products, the Court finds that the Amended Complaint adequately alleges that the misrepresentation claimed with respect to the unpurchased products is sufficiently similar to the misrepresentation for the purchased products.") (internal citation omitted); *Bautista*, 223 F. Supp. 3d at 188–89 (holding that the plaintiff "made a sufficient showing of similarity between the purchased and unpurchased . . . [p]roducts to survive at this stage" when the alleged misrepresentation was the same

despite the products containing different ingredients). Only a single misrepresentation is alleged by Plaintiffs—that each of the eight Infant Formulas contain Heavy Metals when the packaging allegedly suggests they do not. Doc. 1-1 ¶ 48. There is thus no need for unique evidence to demonstrate the misleading nature of multiple claims across different products.

In *Rivera*, class action plaintiffs brought claims pursuant to GBL §§ 349 and 350 against the manufacturer of a line of cleaning products that allegedly misled consumers by labeling the products as non-toxic. *Rivera*, 2021 WL 4392300, at *1–3. Only three of the four products at issue had been purchased by any of the named plaintiffs. *Id.* at *8. The court found the products to be substantially similar because they each allegedly contained several of the same toxic ingredients, they each commanded a price premium based on the misrepresentation, and the misrepresentation was made by the same defendant. *Id.* at *10.

Similarly, the same misrepresentation is allegedly made on each of Mead Johnson's Infant Formulas because they all make similar representations as to the products' health and nutritional value, while allegedly containing Heavy Metals. Doc. 1-1 ¶¶ 48–49. The Infant Formulas are also all substantially similar to one another because, as in *Rivera*, they all render the claims about the health and nutritional value of the Infant Formulas misleading because they contain Heavy Metals, they demand a price premium as a result of the misrepresentation, and they are produced, labeled, packaged, and advertised by Mead Johnson. *Id.* ¶¶ 35, 40. At the motion to dismiss stage, Plaintiffs have satisfied the "substantially similar" test. *See also Lopez*, 2026 WL 788492, at *4 (applying California law and determining the seven Mead Johnson infant formulas in question in the

suit were all "substantially similar in the relevant characteristics"). It is not dispositive, at this stage, that products contained different packaging because "the Court cannot conclude that the variation between the advertisements . . . are meaningful enough to destroy subject matter jurisdiction." *Kacocha*, 2016 WL 4367991, at *10. However, this determination is "subject to further inquiry at the class certification stage." *Richardson v. Edgewell Personal Care, LLC*, 653 F. Supp. 3d 67, 75 (S.D.N.Y. 2023), *vacated and remanded on other grounds*, No. 23-128, 2023 WL 7130940 (2d Cir. Oct. 30, 2023) (quoting *Bautista*, 223 F. Supp. 3d at 188).

This conclusion is well supported by previous decisions of other courts in this Circuit. *See, e.g.*, *id.* (finding that the plaintiff had standing to bring class action claims for twenty different products made by the same defendant, nineteen of which were never purchased by the named plaintiff, because each product was a sunscreen that carried the same misleading label); *Gold v. Eva Naturals, Inc.*, 586 F. Supp. 3d 158, 162 (E.D.N.Y. 2022) (holding that plaintiff had standing for twenty-five different skincare products, despite having only purchased one, because each product featured the same branding and thus the nature of the alleged misrepresentations was sufficiently similar).

For these reasons, at the motion to dismiss stage, the fact that Plaintiffs only purchased one of the eight Infant Formulas does not furnish a basis to dismiss their claims as to the other unpurchased Formulas.

### B. GBL §§ 349 and 350

GBL § 349(a) prohibits deceptive "practices in the conduct of any business, trade or commerce or in the furnishing of any service in [New York]." N.Y. General Business Law § 349(a). GBL § 350 prohibits "[f]alse advertising in the conduct of any business,

trade or commerce or in the furnishing of any service in [New York]." *Id.* § 350. False advertising is defined as "advertising, including labeling, of a commodity, or of the kind, character, terms or conditions of any employment opportunity if such advertising is misleading in a material respect." *Id.* § 350–A(1). "While the standard for recovery under [§] 350 is specific to false advertising, it is otherwise identical to [§] 349." *Yu v. Dreyer's Grand Ice Cream, Inc.*, 592 F. Supp. 3d 146, 154 (S.D.N.Y. 2022) (citing *Cosgrove v. Oregon Chai, Inc.*, 520 F. Supp. 3d 562, 575 (S.D.N.Y. 2021)). Therefore, the Court will analyze the two claims together.

"To state a claim under either section, 'a plaintiff must allege that a defendant has engaged in (1) consumer-oriented conduct that is (2) materially misleading and that (3) plaintiff suffered injury as a result of the allegedly deceptive act or practice.'" *Hofmann v. Long Island University*, No. 22 Civ. 393, 2024 WL 3262819, at *2 (2d Cir. July 2, 2024) (quoting *Orlander v. Staples, Inc.*, 802 F.3d 289, 300 (2d Cir. 2015)). Claims brought under GBL §§ 349 and 350 are not required to meet the heightened pleading requirements of Rule 9(b). *See Cosgrove*, 520 F. Supp. 3d at 575–76.

Mead Johnson contends that Plaintiffs' GBL claims should be dismissed because (1) Plaintiffs fail to allege that they relied on the advertising, (2) the packaging that they did see was not materially misleading, and (3) Plaintiffs cannot trace their damages to the allegedly misleading statements. Doc. 22 at 20.

*1. Reliance*

Mead Johnson clarified that the point of their reliance contention is to question whether the alleged misrepresentation could have caused Plaintiffs' injury if they fail to allege that they saw or cared about the representations. Doc. 24 at 13. Specifically, Mead Johnson claims that Plaintiffs never looked at the statements on its website or the

statements on any products other than Enfamil Nutramigen and can only claim to have been misled by and injured from the packaging for Enfamil Nutramigen. Doc. 22 at 20–22. Plaintiffs argue that (1) contrary to Mead Johnson's assertion, they need not plead reliance for claims pursuant to GBL §§ 349 and 350, (2) their claims are based entirely on the packaging of the products, not statements on Mead Johnson's website, and (3) the question about packaging on the other Infant Formulas relates only to standing, not reliance. Doc. 23 at 22–23.

While Plaintiffs cannot succeed on misrepresentation claims when they fail to allege that they saw any of the supposedly misleading statements, *Grossman v. GEICO Casualty Co.*, No. 21-2789, 2022 WL 1656593, at *3 (2d Cir. May 25, 2022), that is not the case here. Plaintiffs specifically allege that they "read and relied upon the packaging of the Infant Formulas when making their purchasing decisions." Doc. 1-1 ¶ 163. Mead Johnson's reliance on *Grossman* effectively recapitulates its concern about whether Plaintiffs have standing for the products they do not allege they purchased. *Compare* Doc. 24 at 13 (where Mead Johnson proposes that Plaintiffs cannot allege injury for the products they did not purchase because they did not see their labeling) *with* Doc. 22 at 15–16 (where Mead Johnson argues the Plaintiffs lack Article III standing because they cannot allege injury for the products they did not purchase).

The question of injury for the products the Plaintiffs do not allege to have purchased is primarily a concern about standing.

*2. Materially Misleading Affirmative Statements*

Mead Johnson next contends that Plaintiffs insufficiently plead that the packaging was materially misleading because they fail to state what is inaccurate about the affirmative statements on the packaging, and that the Plaintiffs' theory of misrepresentation relies on a "chain of inferences" which do not support the assertion that a reasonable consumer would be misled. Doc. 22 at 22–24. Plaintiffs argue that they sufficiently allege misleading affirmative statements because they cite the specific

language on the packaging which "touts how the Infant Formulas are high quality and promote healthy outcomes that contradict the presence of Heavy Metals, which are nowhere disclosed." Doc. 23 at 20–22. They further argue that determinations about whether the statements are misleading should not be resolved at this stage. *Id.* at 22.

To determine whether an act is materially misleading, the act must be "likely to mislead a reasonable consumer acting reasonably under the circumstances." *Quinn v. Walgreen Co.*, 958 F. Supp. 2d 533, 543 (S.D.N.Y. 2013) (quoting *Maurizio v. Goldsmith,* 230 F.3d 518, 522 (2d Cir. 2000)); *see also Ritchie v. Northern Leasing Systems, Inc.*, No. 12 Civ. 4992 (KBF), 2016 WL 1241531, at *10 (S.D.N.Y. Mar. 28, 2016) ("The definition of 'deceptive acts and practices' is an objective one 'limited to those likely to mislead a reasonable consumer acting reasonably under the circumstances.'" (quoting *Oswego Laborers' Local 214 Pension Fund v. Marine Midland Bank, N.A.*, 85 N.Y.2d 20, 26 (1995))).

"To survive a motion to dismiss, '[p]laintiffs must do more than plausibly allege that a label might conceivably be misunderstood by some few consumers.'" *Cooper v. Anheuser-Busch, LLC*, 553 F. Supp. 3d 83, 94 (S.D.N.Y. 2021) (quoting *Twohig v. Shop-Rite Supermarkets, Inc.*, 519 F. Supp. 3d 154, 160 (S.D.N.Y. 2021)). "Rather, they must 'plausibly allege that a significant portion of the general consuming public or of targeted customers, acting reasonably in the circumstances, could be misled.'" *Id.* (quoting *Twohig*, 519 F. Supp. 3d at 160). The Court may determine, as a matter of law, that an allegedly deceptive advertisement would not mislead a reasonable consumer, *see Fink v. Time Warner Cable*, 714 F.3d 739, 741 (2d Cir. 2013), although the reasonable-consumer inquiry is "generally a question of fact not suited for resolution at the motion to dismiss stage," *Duran v. Henkel of America, Inc.*, 450 F. Supp. 3d 337, 346 (S.D.N.Y. 2020). In evaluating whether there has been a materially misleading affirmative statement, courts will not permit claims "where the plaintiffs' alleged inference appeared fundamentally incompatible with basic common sense." *Cooper*, 553 F. Supp. 3d at 95. However,

courts find that a claim has been stated where the complaint plausibly alleges that a label was misleading. *See Eidelman v. Sun Products Corp.*, No. 16 Civ. 3914 (NSR), 2017 WL 4277187, at *4 (S.D.N.Y. Sept. 25, 2017). Typically, a court only determines that a label is not misleading as a matter of law when it determines that "no reasonable consumer could be misled . . . ." *Id.*

The cases to which Mead Johnson points convey that courts may also dismiss GBL claims when a plaintiff fails to explain why the statements would be misleading to a reasonable consumer, rather than solely because the alleged misleading statement was based on an inference. *See West v. Sambazon, Inc.*, 750 F. Supp. 3d 356, 373 (S.D.N.Y. 2024) ("Plaintiff does not explain what would make . . . a reasonable consumer . . . think . . . that the term "fair trade" or the [Fair For Life] certification meant . . . that they guarantee no child labor or unfair labor practices ever enter the supply chain. Ultimately, Plaintiff's interpretation of the Fresh Juice label is an idiosyncratic reading that cannot support her GBL claims."); *Harris v. Pfizer Inc.*, 586 F. Supp. 3d 231, 243–44 (S.D.N.Y. 2022) (determining that the plaintiffs failed to allege that the drug listing varenicline as its active ingredient was false or misleading because "[i]t is not enough to allege that the plaintiffs inferred . . . the product did not contain N-nitroso-varenicline . . . [U]nder the GBL . . . an incorrect impression . . . must be reasonably traceable to a misleading statement from the defendant"); *Gordon v. Target Corp.*, No. 20 Civ. 9589 (KMK), 2022 WL 836773, at *10 (S.D.N.Y. Mar. 18, 2022) (determining that the plaintiff "failed to actually identify a material misstatement or omission on the Product's label that would deceive a reasonable consumer, which is fatal to her claim").

Plaintiffs contend that they sufficiently explain why the alleged misstatements would mislead a reasonable consumer by analogizing to *Hernandez v. Wonderful Co. LLC*, No. 23 Civ. 1242 (ER), 2024 WL 4882180 (S.D.N.Y. Nov. 25, 2024), Doc. 23 at 21, in which the court declined to dismiss a case alleging that an "All Natural" label was materially misleading because the product contained PFAS, *Hernandez*, 2024 WL

4882180. The court presumed that the presence of PFAS would be concerning to consumers given "recent authority discussing the . . . many particular health risks associated with PFAS," despite the defendant's argument that PFAS were "ubiquitous microcontaminants in our food . . . ." *Id.* at *7 (record citation omitted). Plaintiffs argue that the same reasoning applies here because of the health risks of Heavy Metals. Doc. 23 at 21. However, as Mead Johnson counters, *Hernandez* is distinguishable because the presence of PFAS directly contradicted the label advertising the product as *all* natural. This case is less clear because Plaintiffs do not allege that the Infant Formulas advertised that they did not contain Heavy Metals, but that the packaging misleadingly represented the products as healthy, safe, and nutritious when they contained or risked containing Heavy Metals. Doc. 1-1 ¶ 51. Plaintiffs contend that the affirmative statements on the packaging, such as "Brain Building," "expert recommended," "#1 Recommended Brand by Pediatricians," among others, would mislead a reasonable consumer, distinguishing it from the cases on which Mead Johnson relies. *Id.* ¶¶ 49–51. In evaluating the instant motion, the touchstone of the Court's analysis is whether the complaint plausibly alleges that a consumer, "acting reasonably in the circumstances, could be misled" by the packaging. *Cooper*, 553 F. Supp. 3d at 94 (quoting *Twohig*, 519 F.Supp.3d at 160).

In support of the allegation that the affirmative statements would materially mislead a reasonable consumer that the Infant Formulas did not contain or risk containing Heavy Metals, Plaintiffs point to a consumer survey conducted by Plaintiffs' counsel. Doc. 1-1 ¶¶ 147. In the survey, 77.8% of people answered "No" when asked whether "[a]fter seeing the label [on the Infant Formula] would you expect arsenic, cadmium, lead, and/or mercury in the [I]nfant [F]ormula?" *Id.* Mead Johnson argues that this is insufficient to allege a reasonable consumer would be misled because the survey asks whether a consumer would expect the presence of Heavy Metals, while "the GBL asks whether the label itself miscommunicates that [H]eavy [M]etals are absent." Doc. 22 at 24 n.5. Mead Johnson is correct that this does not *prove* the label is materially

misleading to a reasonable consumer; but, "at the motion to dismiss stage, district courts in the Second Circuit have tended to resolve the test against a plaintiff as a matter of law only where . . . a plaintiff's claims as to the impressions that a reasonable consumer might draw are patently implausible or unrealistic." *Pellegrino v. Procter & Gamble Co.*, No. 23 Civ. 10631 (KMK), 2026 WL 880573, at *14 (S.D.N.Y. Mar. 31, 2026) (internal citations and quotation marks omitted). It is only "'rare situation[s] in which granting a motion to dismiss is appropriate' with respect to the issue of whether a reasonable consumer would be misled by representations about a product." *Kacocha*, 2016 WL 4367991, at *16 (quoting *Williams v. Gerber Products Co.*, 552 F.3d 934, 939 (9th Cir. 2008)). Also, plaintiffs often use consumer surveys to help support a claim that a reasonable consumer would be misled by advertising. *See Duncan v. Kahala Franchising, L.L.C.*, 732 F. Supp. 3d 255, 263 (E.D.N.Y. 2024) (listing "consumer survey evidence" as one of five types of evidence that contribute to "provid[ing] a useful framework in analyzing the sufficiency of allegations concerning consumer expectations under GBL § 349 and § 350").

Plaintiffs' pleading satisfies this low burden because it demonstrates that the *majority* of consumers would assume the product did not contain Heavy Metals based on its label. This does not definitively establish that a *reasonable* consumer would be misled by the packaging. However, at this stage, despite certainly requiring an inferential leap, Plaintiffs sufficiently allege that this supposed deception is not "patently implausible" such that the Court can determine as a matter of law that reasonable consumers could not be misled by the packaging. *Pellegrino*, 2026 WL 880573, at *14;[10] see *also Levy v. Hu*

---

[10] The court in *Lopez v. Mead Johnson* dismissed the complaint in a case with essentially the same facts, but under California law, because it determined the claims were "implausible assertions" and determined a substantially similar survey to the one Plaintiffs use did not convince the court otherwise. *Lopez*, 2026 WL 788492, at *6. On the other hand, the court in *Raya v. Mead Johnson*, again dealing with essentially the same facts, but considering only an omissions-based claim under Illinois law, relied on a substantially similar survey to the one Plaintiffs use to determine that the plaintiff adequately alleged that the packaging was misleading and that the risk of Heavy Metals was material to consumers. *Raya*, 758 F. Supp. 3d at

*Products LLC*, No. 23 Civ. 1381 (AT), 2024 WL 897495, at *7 (S.D.N.Y. Mar. 1, 2024) (finding that the plaintiff plausibly alleged that a chocolate bar's positive representations could mislead a reasonable consumer into believing the product did not contain lead).

Mead Johnson also contends that Plaintiffs cannot succeed on any affirmative misrepresentation claims because they fail to allege that any of the statements are false. Doc. 22 at 22. Plaintiffs merely allege that these affirmative statements imply the health and nutritional value of the Infant Formulas, which is contradicted by the presence of Heavy Metals. Doc. 1-1 ¶¶ 48–49. However, contrary to Mead Johnson's contention,[11] "a statement need not be literally false to be prohibited by GBL [§§] 349 and 350. A reference to an ingredient can convey an implicit message even in the absence of an express promise." *Ripa v. Unilever United States Inc.*, No. 25 Civ. 10028 (CM), 2026 WL 811180, at *8 (S.D.N.Y. Mar. 23, 2026) (finding that, while a reference to an ingredient can convey an implicit message, plaintiffs failed to plead any facts tending to show that consumers would believe the implicit message from the product's labels); *see also Pellegrino*, 2026 WL 880573, at * 16 ("[F]alsity is not required because a plaintiff can also 'succeed on a claim . . . under GBL [§§] 349 and 350' by alleging that 'the defendant's deceptive acts are false *or* misleading.'" (emphasis in original) (quoting *Wedra v. Cree, Inc.*, No. 19 Civ. 3162 (VLB), 2022 WL 2116760, at *6 n.5 (S.D.N.Y. June 13, 2022))).

---

832. Under New York law, a court should only determine that packaging is not materially misleading in "rare situation[s]," *Kacocha*, 2016 WL 4367991, at *16, where the claim is "patently implausible," *Pellegrino*, 2026 WL 880573, at *14. Despite *Lopez*, this Court does not find it to be one of those instances.

[11] Mead Johnson relies on *Fink*, 714 F.3d 739 to assert that Plaintiffs needed to state which claims it alleged were false. Doc. 22 at 22. However, the Second Circuit in *Fink* affirmed the dismissal of the complaint because the allegations in the complaint were materially inconsistent with the advertisement at issue. *Fink*, 714 F.3d at 742 ("A plaintiff who alleges that he was deceived by an advertisement may not misquote or misleadingly excerpt the language of the advertisement in his pleadings and expect his action to survive a motion to dismiss or, indeed, to escape admonishment.").

*3. Materially Misleading Omissions*

Plaintiffs also base their misrepresentation claim on an omission theory, alleging that Mead Johnson acted deceptively by failing to disclose the presence of Heavy Metals. Doc. 23 at 23. Plaintiffs contend that Mead Johnson had superior knowledge that was not readily available and knew that consumers were acting under a mistaken belief. Doc. 1-1 ¶¶ 110–18, Doc. 23 at 24.[12] In response, Mead Johnson first argues that the claim must fail because Plaintiffs failed to allege that knowledge about Heavy Metals was solely in its possession and that consumers could not obtain the information, and then attempts to distinguish this case from the cases that follow the "superior knowledge" standard because they contend the presence of Heavy Metals in food is widely known, and the complaint itself acknowledges this fact. Docs. 22 at 26, 24 at 10–11.

The New York Court of Appeals, in *Oswego*, stated that the GBL "does not require businesses to ascertain consumers' individual needs and guarantee that each consumer has all relevant information specific to its situation." *Oswego*, 85 N.Y.2d at 26. But, at the motion to dismiss stage, "a plaintiff bringing an omission-based claim for § 349 liability must show that 'the business alone possesses material information that is relevant to the consumer and fail[ed] to provide this information,' or that plaintiffs could not 'reasonably have obtained the relevant information they now claim the [defendant] failed to provide.'" *Paradowski v. Champion Petfoods USA, Inc.*, No. 22 Civ. 962, 2023 WL 3829559, at *2 (2d Cir. June 6, 2023) (quoting *Oswego*, 85 N.Y.2d at 26–27).

Several courts, in similar instances, have found that the plaintiffs sufficiently alleged an omissions-based theory despite the information being publicly available. In *Nurture*, the court found that the plaintiffs sufficiently alleged an omission under *Paradowski*, where they alleged that they were unaware that the baby food had a material

---

[12] Plaintiffs refer to the "superior knowledge test," which states that a business has a duty to disclose information "where one party possesses superior knowledge, not readily available to the other, and knows that the other is acting on the basis of mistaken knowledge." *Brass*, 987 F.2d at 150 (quoting *Aaron Ferer & Sons Ltd. v. Chase Manhattan Bank, N.A.,* 731 F.2d 112, 123 (2d Cir.1984)).

risk of containing Heavy Metals, that reasonable consumers lack scientific knowledge, and that the defendants knew that reasonable consumers seek out products that are free of Heavy Metals. *Nurture*, 2025 WL 918927, at *15. Similarly, in *Levy*, the court found that the plaintiff sufficiently pleaded an omission by alleging that a consumer could not reasonably know the levels of Heavy Metals present in the product because it would require scientific testing. *Levy*, 2024 WL 897495, at *6. And, in *In re Lindt & Sprungli (USA), Inc., Dark Chocolate Litigation*, the court found the pleading sufficient when the plaintiff alleged that consumers lack the scientific knowledge to determine whether the product contained Heavy Metals and in what quantity. *Lindt*, No. 23 Civ. 1186 (AMD) (JAM), 2024 WL 4107244, at *7 (E.D.N.Y. Sept. 6, 2024).[13]

In this case, Plaintiffs contend that Mead Johnson had superior knowledge about the quality and nutritional value of its products, including the presence or material risk of Heavy Metals. Doc. 1-1 ¶ 59. Crucially, Plaintiffs also allege that consumers reasonably expected Mead Johnson to test for Heavy Metals and disclose that information to the public, *id.* ¶ 139, that Mead Johnson deceptively hid that it failed to monitor the presence of Heavy Metals in its products, *id.* ¶ 132, and that consumers could not detect the presence of Heavy Metals in the Infant Formulas without conducting scientific tests, *id.* ¶ 144. Therefore, the instant action is comparable to *Nurture*, 2025 WL 918927, *Levy*, 2024 WL 897495, and *Lindt*, 2024 WL 4107244—Plaintiffs allege that reasonable consumers would not have known that the Infant Formulas contained Heavy Metals because of Mead Johnson's deceptive acts.

Mead Johnson analogizes the instant action to *Paradowski*, Doc. 22 at 26, in which the Second Circuit affirmed the district court's grant of summary judgment in favor of the defendant because the public was aware of the presence or risk of Heavy Metals in

---

[13] *Lindt*, 2024 WL 4107244, at *6, and *Nurture*, 2025 WL 918927, at *15, both also discuss the "superior knowledge" test, finding that it is not inconsistent with the test set forth in *Paradowski*, 2023 WL 3829559, at *2, finding an omission is actionable when (1) the business had exclusive knowledge of material information or (2) when consumers could not have reasonably obtained the material information.

dog food, *Paradowski*, 2023 WL 3829559, at *3. However, that case is distinguishable because the court relied on the factual record which "establishe[d] that a reasonable consumer could have discovered that [the product] had a material risk of containing some measurable amount of heavy metals." *Paradowski*, 2023 WL 3829559, at *3; *see Nurture*, 2025 WL 918927, at *15 (distinguishing *Paradowski* for the same reason). This case is in a different procedural posture. Also, *Gordon*, which Mead Johnson argues is analogous, Doc. 22 at 26, is not persuasive because that court solely considered whether the defendant "alone possess[ed] the information" that was omitted. *Gordon*, 2022 WL 836773, at *10. A court should also consider whether the plaintiff could reasonably have obtained the relevant information they claimed the defendant failed to provide. *Paradowski*, 2023 WL 3829559, at *2.

Courts have routinely permitted omission-based claims at the motion to dismiss stage before a factual record has been developed even when the defendant contends that a reasonable consumer would know the allegedly omitted information. *See Franklin v. General Mills, Inc.*, No. 21 Civ. 01781 (JMA) (AYS), 2025 WL 2614970, at *13 (E.D.N.Y. Sept. 10, 2025) ("Dismissal is therefore premature, as a fully developed factual record is necessary to determine what a reasonable consumer could have discovered regarding the amount of phthalates present in the Products during the relevant time period."); *Nurture*, 2025 WL 918927, at *15 ("[T]he Court cannot assume or infer on a motion to dismiss that the average consumer would know of the findings in the Congressional Report, have access to facts or scientific know-how to interpret them or apply them in their decision-making regarding purchases of Baby Foods."). Mead Johnson argues that this case is different because Plaintiffs' complaint refers to many different sources, including scientific articles, congressional reports, and news articles, stating that Heavy Metals are typically found in all foods and are commonly present in infant formulas. Doc. 22 at 25. Nonetheless, Plaintiffs do contend that the presence or risk of Heavy Metals in the Infant Formulas was not readily available to consumers

because they allege reasonable consumers would expect Mead Johnson to test for and disclose the presence of Heavy Metals, Doc. 1-1 ¶ 139, would not expect Heavy Metals to be present, *id.* ¶ 144, and could not determine whether Heavy Metals were present without scientific testing, *id.* "[T]he public availability of . . . documents referenced in the [complaint] at this stage does not and cannot properly refute Plaintiffs' allegations of their lack of knowledge." *Nurture*, 2025 WL 918927, at *15.

Therefore, at this stage, Plaintiffs have sufficiently pleaded that Mead Johnson's affirmative statements and omissions would mislead reasonable consumers, even if that is proven to be untrue after the parties fully develop the factual record. *See also Raya*, 758 F. Supp. 3d at 832 (applying Illinois law and finding that the plaintiff's omission theory sufficiently pleaded that Mead Johnson's packaging was "materially misleading" in an action involving seven of the eight Infant Formulas).

*4. Materiality to a Reasonable Consumer*

Mead Johnson contends that Plaintiffs fail to allege that the presence of Heavy Metals is material to a reasonable consumer, merely stating that it was material to them, individually. Doc. 22 at 26–27. Mead Johnson further argues that it is publicly known that many food products contain Heavy Metals without consumers being concerned, implying that the presence of Heavy Metals is not material to reasonable consumers. *Id.* at 27. Plaintiffs argue that materiality is not a separate element, and that even if it was an element, the complaint sufficiently alleges that reasonable consumers would find the presence of Heavy Metals material. Doc. 23 at 25–26.

Mead Johnson points to *Pichardo v. Only What You Need, Inc.*, No. 20 Civ. 493 (VEC), 2020 WL 6323775 (S.D.N.Y. Oct. 27, 2020) to argue that the presence of Heavy Metals would not be material since it is present in nearly all foods. Doc. 22 at 27. While this case does discuss whether the alleged deception would be material to a reasonable consumer's purchasing habits, it is distinguishable from the instant action. In *Pichardo*, the plaintiff alleged that a label touting a product to be "vanilla-flavored" did not mean

the "vanilla taste came exclusively from the vanilla plant." *Pichardo*, 2020 WL 6323775, at *1. The court held that the complaint failed to sufficiently allege why that would be material to a reasonable consumer given that the vast majority of vanilla products do not come exclusively from the vanilla plant. *Id.* at *5–6.

The instant action, which deals with Heavy Metals, is more similar to *Hernandez*, in which the product contained PFAS despite being labeled as "All Natural;" the court "presume[d] that the presence of PFAS would be concerning to many consumers" because of "the many particular health risks associated with PFAS." *Hernandez*, 2024 WL 4882180, at *7 (quoting *Winans v. Oruna Foods North America Inc.*, 731 F. Supp. 3d 422, 430 (E.D.N.Y. 2024)). Moreover, there are many health risks associated with Heavy Metals, particularly for infants, and it is reasonable that "most consumers strongly prefer to avoid [Heavy Metals] in food they feed children." Doc. 1-1 ¶ 3. The Court finds it reasonable to assume that the presence of Heavy Metals would be material to reasonable consumers because of their health risks. Mead Johnson argues that *Hernandez* does not address how its "analysis would change if PFAS were ubiquitous in all foods," Doc. 24 at 12, but the court in *Hernandez* directly acknowledges that PFAS are "ubiquitous microcontaminants in our food and environment," *Hernandez*, 2024 WL 4882180, at *7 (record citation omitted).

Nonetheless, as Plaintiffs argue, "materiality is not a separate element; rather, to state a GBL claim, the plaintiff must plead the existence of a material misrepresentation that is likely to mislead a reasonable consumer." *Winans*, 731 F. Supp. 3d at 430 (citing *Cooper*, 553 F. Supp. 3d at 108). Furthermore, "even if materiality were a separate, required element, the Court cannot conclude, *as a matter of law*, that the presence of [Heavy Metals in Infant Formula] is immaterial to a reasonable consumer." *Id.* (emphasis added).

*5. Actual Injury*

Lastly, Mead Johnson contends that Plaintiffs have insufficiently alleged a price premium theory of injury because "[t]hey do not say what that premium is, or how it is connected to the alleged presence of [H]eavy [M]etals in the [p]roducts." Doc. 22 at 27–29. Plaintiffs counter that alleging a price premium theory is sufficient to plead injury, distinguishing the cases Mead Johnson relies upon because they dealt with discounted products at outlet stores. Doc. 23 at 27–28.

When alleging a price premium theory pursuant to GBL §§ 349 and 350, Plaintiffs must show a "connection between the misrepresentation and any harm from, or failure of, the product." *Small v. Lorillard Tobacco Co.*, 94 N.Y.2d 43, 56 (1999). Courts have noted a line of cases, asserting price premium theories, in which the necessary connection discussed in *Small* "is clear" because "the product is marketed as having a unique quality," the "marketing allows the company to charge a premium," and the "[p]laintiff pays that premium and learns that the product does not have the unique quality it was marketed for." *DaCorta v. AM Retail Grp., Inc.*, No. 16 Civ. 01748 (NSR), 2018 WL 557909, at *8 (S.D.N.Y. Jan. 23, 2018).

In the price premium context, where the marketing of a product imports a unique quality to it, courts have generally found that allegations that plaintiffs paid a premium they would not have otherwise paid are sufficient at the pleading stage. *See Segedie v. Hain Celestial Group, Inc.*, No. 14 Civ. 5029 (NSR), 2015 WL 2168374, at *12 (S.D.N.Y. May 7, 2015) ("Plaintiffs have also adequately alleged injury by claiming that they paid a price premium that they would not have paid if the products were not labeled 'natural' or 'all natural.'"); *Rivera*, 2021 WL 4392300, at *7 (finding the plaintiffs sufficiently pleaded injury when they alleged that the company sold the products at higher prices in part because consumers are willing to pay more for products that are environmentally sound and safer alternatives to traditional cleaners); *Axon v. Florida's Natural Growers, Inc.*, 813 F. App'x 701, 704 (2d Cir. 2020) (finding that allegations that

the price of the product was inflated because of the defendant's deception meets the injury requirement).

In arguing that Plaintiffs must allege additional facts concerning the market value of the products absent the alleged misrepresentation, Mead Johnson primarily relies on cases which courts have classified as so-called Outlet Cases, in which a store deceptively states a product is being sold at a large discount, when that is not the case. Docs. 22 at 28, 24 at 13; *see, e.g.*, *Molayem v. Ralph Lauren Corp.*, No. 24 Civ. 4816 (JGLC), 2025 WL 2773290 (S.D.N.Y. Sept. 29, 2025), at *3, *judgment entered*, No. 24 Civ. 4816 (JGLC), 2026 WL 866439 (S.D.N.Y. Mar. 30, 2026) (finding that courts consistently dismiss a price premium theory in Outlet Cases where the plaintiffs believed they were getting a bargain based on a mislabeled original price); *DaCorta*, 2018 WL 557909, at *8 (same); *Irvine v. Kate Spade & Co.*, No. 16 Civ. 7300 (JMF), 2017 WL 4326538, at *4 (S.D.N.Y. Sept. 28, 2017) (same). However, courts have distinguished Outlet Cases from price premium cases because in price premium cases "there is a definitive connection between the misrepresentation (that the product had a unique quality) and the harm from the product (plaintiff paid a premium for a product without this unique quality)." *DaCorta*, 2018 WL 557909, at *8. But, in the Outlet Cases, "[w]ithout allegations as to the value, *or the unique quality* for which the premium was paid, there can be no connection between the misrepresentation and the harm from the product." *Id.* (emphasis in original).

The instant case is not an Outlet Case because it does not involve an allegedly largely discounted product. Plaintiffs allege that Mead Johnson promoted the Infant Formulas as particularly high quality and nutritious, through claims such as "#1 Recommended Brand by Pediatricians" and "Brain Building," to justify a premium price. Doc. 1-1 ¶ 18, 33. Plaintiffs allege that they paid the price premium for the Infant Formulas that did not deliver what was promised. *Id.* ¶¶ 35, 40. Therefore, Plaintiffs have sufficiently pleaded a price premium theory of injury by alleging that the Infant

Formulas were marketed as having a unique quality, Plaintiffs paid a premium price because of that quality, and the products were not actually high quality, healthy, and nutritious because of the undisclosed presence of Heavy Metals.

**C. Fraudulent Misrepresentation**

Mead Johnson argues that Plaintiffs' fraudulent misrepresentation claims must fail for the same reasons as the GBL claims. Doc. 22 at 29. Mead Johnson argues that Plaintiffs claims are insufficient because they fail to "point to a material misrepresentation," "do not establish reliance," and do "not plead damages." Doc. 22 at 29. Mead Johnson also argues that Plaintiffs wholly fail to allege fraudulent intent. *Id.* at 29–31. Plaintiffs contend they sufficiently alleged fraudulent intent by claiming that Mead Johnson sought "to capitalize on consumer beliefs as to the high quality of the Infant Formulas and quality standards and concealed material facts," bolstered by alleging that Mead Johnson sought to conceal the truth through the lobbying efforts of INCA, of which Mead Johnson is a member. Doc. 23 at 29–30.

"To state a claim of common law fraud under New York law, a plaintiff must allege that the defendant made '(1) a material misrepresentation or omission of fact; (2) which the defendant knew to be false; (3) which the defendant made with the intent to defraud; (4) upon which the plaintiff reasonably relied; and (5) which caused injury to the plaintiff.'" *Yu*, 592 F. Supp. 3d at 163–64 (quoting *Financial Guaranty Insurance Co. v. Putnam Advisory Co., LLC*, 783 F.3d 395, 402 (2d Cir. 2015). "[F]raud claims—including common law fraud claims—are subject to the heightened pleading standard set forth in Rule 9(b)," *Hawkins v. Coca-Cola Co.*, 654 F.Supp.3d 290, 299 (S.D.N.Y. 2023), which requires that the complaint "state with particularity the circumstances constituting fraud," Fed. R. Civ. P. 9(b). "Specifically, to meet this requirement, a plaintiff must '(1) specify the statements that the plaintiff contends were fraudulent, (2) identify the speaker, (3) state where and when the statements were made, and (4) explain why the statements were fraudulent.'" *Yu*, 592 F. Supp. 3d at 164 (quoting *ATSI Communications, Inc. v.*

*Shaar Fund, Ltd.*, 493 F.3d 87, 99 (2d Cir. 2007) (citing *Novak v. Kasaks*, 216 F.3d 300, 306 (2d Cir. 2000))). While a fraud claim may plead scienter generally, "the plaintiff must still allege facts that give rise to a strong inference of fraudulent intent." *Colpitts v. Blue Diamond Growers*, 527 F. Supp. 3d 562, 585 (S.D.N.Y. 2021) (quoting *Hesse v. Godiva Chocolatier, Inc.*, 463 F. Supp. 3d 453, 472 (S.D.N.Y. 2020)). This inference may be established by (1) "alleging facts to show that defendants had both motive and opportunity to commit fraud," or (2) "alleging facts that constitute strong circumstantial evidence of conscious misbehavior or recklessness." *Id.* (quoting *Duran*, 450 F. Supp. 3d at 353).

"On a motion to dismiss, [a] fact may not be dismissed as immaterial unless it is so obviously unimportant . . . that reasonable minds could not differ on the question of [its] importance." *Label Health, LLC v. United American Supply, LLC*, No. 20 Civ. 5161 (PAE), 2021 WL 638624, at *7 (S.D.N.Y. Feb. 17, 2021) (internal citations and quotation marks omitted). Also, for the reliance prong, defendants can only prevail if it was categorically unreasonable for the plaintiff to rely on the representation. *Id.* at *8. As discussed above, Plaintiffs have sufficiently alleged that Mead Johnson (1) made a material misrepresentation or omission of fact, (2) Plaintiffs relied on that misrepresentation, and (3) they faced injury through a price premium theory.

Mead Johnson also contends that Plaintiffs' claims fail because they do not sufficiently allege fraudulent intent, as required by Rule 9(b)'s heightened pleading standard. Doc. 22 at 29–31. Mead Johnson contends that Plaintiffs cannot rely on its general profit motive to plead scienter. *Id.* at 30–31. However, Plaintiffs allege that Mead Johnson "intended to capitalize on consumer beliefs as to the high quality of the Infant Formulas and quality standards and concealed material facts," which they argue is sufficient to plead scienter. Doc. 23 at 29–30.

While "pointing to a company's general profit motive is insufficient to plead scienter," *Gordon*, 2022 WL 836773, at *17, several courts have found that alleging the

defendant sought to capitalize on mistaken beliefs is typically sufficient to plead fraudulent intent at the motion to dismiss stage, *see Nurture*, 2025 WL 918927, at *14 (holding that the plaintiff sufficiently alleged scienter by pleading that the defendant capitalized on consumers' mistaken belief that the infant formula was high quality); *Cooper*, 553 F. Supp. 3d at 114 (finding that plaintiffs may establish scienter by plausibly alleging that the defendant "was aware of consumers' preferences for beverages with distilled liquor or wine, and then deliberately marketed the Products as such in order to capitalize on that market"); *Izquierdo v. Panera Bread Co.*, 450 F. Supp. 3d 453, 466–67 (S.D.N.Y. 2020) (the Court finding that the plaintiff "just barely" alleged scienter for his fraud claim where he alleged the defendant knew the products true composition, containing imitation blueberries, made the product in such a way as to conceal that it contained imitation blueberries, was aware of consumer beliefs about the health of blueberries, and sought to capitalize on those beliefs).

Mead Johnson notes that Plaintiffs seem to argue that it acted negligently in failing to monitor the presence of Heavy Metals in its Infant Formulas, which would fail to sufficiently allege scienter. Doc. 22 at 30. While Plaintiffs do suggest that Mead Johnson may have been negligent, Doc. 1-1 ¶¶ 11, 148, they repeatedly allege that Mead Johnson intended to capitalize on consumers' beliefs both about the company and the Infant Formulas. Plaintiffs allege that Mead Johnson "presented itself to parents as a company they could trust." Doc. 1-1 ¶ 3. They allege that, to induce consumers to believe in the quality and nutritional value of its products and to justify a price premium, Mead Johnson chose to promote the Infant Formulas on its packaging as high quality and made with nutritious ingredients. *Id.* ¶ 18. Plaintiffs state that Mead Johnson knows its customers trust the quality of its products, that customers seek out and wish to purchase infant formulas that possess nutritious ingredients free of toxins, contaminants, or chemicals, and will pay for infant formulas they believe possess these qualities. *Id.* ¶ 21. Plaintiffs allege that Mead Johnson knowingly, recklessly, or intentionally "failed to

disclose on its packaging any mention of the presence (or risk) of Heavy Metals." *Id.* ¶ 61. Lastly, they allege that these material misrepresentations and omissions allowed Mead Johnson to reap enormous profits from consumers who paid a premium price for Infant Formulas. *Id.* ¶ 25.

Plaintiffs have sufficiently pleaded that Mead Johnson sought to capitalize on the mistaken beliefs of reasonable consumers about the health and quality of the Infant Formulas. These pleadings allege facts that provide "strong circumstantial evidence of conscious misbehavior or recklessness." *Colpitts*, 527 F. Supp. 3d at 585 (quoting *Duran*, 450 F. Supp. 3d at 353).

While not necessary to decide whether Plaintiffs sufficiently alleged scienter on the motion to dismiss, Mead Johnson also contends that its efforts as part of a trade organization to lobby against a California bill that would require disclosure of Heavy Metals content is insufficient to plead scienter because it is "legitimate First Amendment activity," not "conscious misbehavior." Doc. 24 at 14. The Court agrees that this allegation alone is not sufficient to establish the required "strong circumstantial evidence," but it can serve to bolster Plaintiffs' claims. *See Ebin v. Kangadis Food Inc.*, No. 13 Civ. 2311 (JSR), 2013 WL 6504547, at *6 (S.D.N.Y. Dec. 11, 2013) (finding allegations that the defendant's employee lobbied against Connecticut passing a law banning olive oil products that do not conform to international standards, when the label of the defendant's product were alleged to deceptively suggest it would conform to the standard, was relevant to pleading scienter). As in *Ebin*, Mead Johnson's alleged efforts to conceal the testing and publication of the levels of Heavy Metals in its products support Plaintiffs' claim that Mead Johnson recognized consumer concern for the possible presence of Heavy Metals in infant formulas. Doc. 1-1 ¶ 113.

For these reasons, Plaintiffs have sufficiently alleged knowledge and fraudulent intent, satisfying the pleading requirements to allege that Mead Johnson engaged in fraudulent misrepresentation.

**D. Unjust Enrichment**

Mead Johnson contends that Plaintiffs' unjust enrichment claim should fail because they rely on the same facts and theory to develop their other claims, and unjust enrichment cannot be used as a "back-up claim." Doc. 22 at 32–33. Plaintiffs, however, argue that they can plead unjust enrichment in the alternative and that it is not duplicative since the elements of unjust enrichment are distinct from the elements of their other claims. Doc. 23 at 31.

To prevail on an unjust enrichment claim in New York, a plaintiff must show: (1) that the defendant benefitted, (2) at the plaintiff's expense, and (3) that "equity and good conscience" require restitution. *Kaye v. Grossman*, 202 F.3d 611, 616 (2d Cir. 2000). A plaintiff must also show that the defendant actually received a benefit. *Regnante v. Securities & Exchange Officials*, 134 F. Supp. 3d 749, 772 (S.D.N.Y. 2015) (citing *Legurnic v. Ciccone,* 63 F.Supp.3d 241, 248 (E.D.N.Y.2014)). Under New York law, an unjust enrichment claim requires no direct relationship between plaintiff and defendant, and it does not matter whether the benefit is directly or indirectly conveyed. *Myun-Uk Choi v. Tower Research Capital LLC*, 890 F.3d 60, 69 (2d Cir. 2018).

Unjust enrichment "is available only in unusual situations when, though the defendant has not . . . committed a recognized tort, circumstances create an equitable obligation running from the defendant to the plaintiff. It is not available where it simply duplicates, or replaces, a conventional contract or tort claim." *Corsello v. Verizon New York, Inc.*, 18 N.Y.3d 777, 779 (2012). "[T]he case law clearly establishes that unjust enrichment claims are duplicative of [GBL] claims where they are premised on the same 'factual allegations and the same theory of liability.'" *Ham v. Lenovo (United States) Inc.*, No. 22 Civ. 05131 (ALC), 2024 WL 1348707, at *8 (S.D.N.Y. Mar. 29, 2024) (quoting *Hesse*, 463 F. Supp. 3d at 474).

Unjust enrichment must be dismissed as duplicative when a court "cannot conceive of any set of facts upon which [Plaintiffs] would fail to establish [their] . . .

statutory claims, but nonetheless succeed in proving unjust enrichment." *Cooper*, 553 F. Supp. 3d at 116 (quoting *Silva v. Smucker Natural Foods, Inc.*, No. 14 Civ. 6154 (JG), 2015 WL 5360022, at *12 (E.D.N.Y. Sept. 14, 2015); *see also Del Rosario v. Sazerac Co., Inc.*, No. 23 Civ. 1060 (AS), 2023 WL 6318083, at *3 (S.D.N.Y. Sept. 28, 2023) (finding an unjust enrichment claim was improper because the plaintiff did "not establish how she could fail to prove [her statutory] claims and yet still show that [the defendant's] retention of her money [was] unjust").

Plaintiffs cite two cases that they argue permit them to plead unjust enrichment in the alternative because Federal Rule of Civil Procedure 8(d)(3) permits a party to "state as many separate claims or defenses as it has, regardless of consistency." Fed. R. Civ. P. 8(d)(3); *see Mason v. Reed's Inc.*, 515 F. Supp. 3d 135, 147 (S.D.N.Y. 2021); *East Coast Advanced Plastic Surgery, LLC v. Cigna Health & Life Insurance Co.*, No. 25 Civ. 1686 (PAE), 2025 WL 2371537, at *13 (S.D.N.Y. Aug. 14, 2025), *cert. denied sub nom. Connecticut General Life Insurance Co. v. East Coast Advanced Plastic Surgery, LLC*, No. 25 Civ. 1686 (PAE), 2025 WL 3154472 (S.D.N.Y. Nov. 12, 2025). However, other courts have held that "even pleaded in the alternative, claims for unjust enrichment will not survive a motion to dismiss where plaintiffs fail to explain how their unjust enrichment claim is not merely duplicative of their other causes of action." *Carovillano v. Sirius XM Radio Inc.*, 715 F. Supp. 3d 562, 586 (S.D.N.Y. 2024) (quoting *Nelson v. MillerCoors, LLC*, 246 F. Supp. 3d 666, 679 (E.D.N.Y. 2017)). These cases are more persuasive because they more closely conform to the standard set out in *Corsello*, which is binding on this court, stating that unjust enrichment is intended only for "unusual situations" and cannot "simply duplicate[], or replace[]" other claims. *Corsello*, 18 N.Y.3d at 779.

Plaintiffs also cite two cases which permit seemingly duplicative unjust enrichment claims at the motion to dismiss stage because the elements of unjust enrichment are different than the elements of the plaintiff's statutory claims. *See United*

*States f/u/b/o Schindler Elevator Corp. v. Philadelphia Indemnity Insurance Co.*, No. 24 Civ. 3108 (JGK), 2025 WL 1992969, at *5 (S.D.N.Y. July 16, 2025); *Warner v. StarKist Co.*, No. 18 Civ. 406 (GLS) (ATB), 2019 WL 1332573, at *3 (N.D.N.Y. Mar. 25, 2019). *Schindler Elevator* permitted the unjust enrichment claim because whether there was a valid contract was directly in dispute, so the court found that the plaintiff could fail on its other claims and succeed on its unjust enrichment claim. *Schindler Elevator*, 2025 WL 1992969, at *5. The court said that this possibility distinguishes it from cases where courts have found unjust enrichment claims duplicative, *id.*, making it one of the "unusual situations" in which the unjust enrichment claim is proper, *Corsello*, 18 N.Y.3d at 779. Nonetheless, the Second Circuit has stated that "[t]wo claims are duplicative of one another if they 'arise from the same facts . . . and do not allege distinct damages,'" *NetJets Aviation, Inc. v. LHC Communications, LLC*, 537 F.3d 168, 175 (2d Cir. 2008) (quoting *Sitar v. Sitar,* 854 N.Y.S.2d 536, 538 (2d Dep't 2008)), and the New York Court of Appeals stated that unjust enrichment is not proper when it "simply duplicates" other claims, *Corsello*, 18 N.Y.3d at 779; *see also Cooper*, 553 F. Supp. 3d at 117 (determining it "is inconsistent with the vast weight of case law" and with the rule that "[t]wo claims are duplicative of one another if they 'arise from the same facts and do not allege distinct damages'" to find that a claim is not duplicative because it has different elements (quoting *NetJets*, 537 F.3d at 168)). Accordingly, this Court is persuaded by the cases which find that claims for unjust enrichment are duplicative, and thus not permissible, when they necessarily succeed or fail with other claims the plaintiff has asserted.

Here, Plaintiffs have failed to allege that Mead Johnson unjustly received financial benefit from the purchase of the Infant Formulas in any manner that is different than the allegations giving rise to the GBL claims. Doc. 1-1 ¶¶ 229–32. Plaintiffs fail to allege any wrongful activity from which Mead Johnson financially benefitted that is separate from those used to develop the GBL and fraud claims. *Id.* ¶ 231 ("It would be inequitable, unconscionable, and unjust for [Mead Johnson] to be permitted to retain

these economic benefits because the benefits were procured as a direct and proximate result of its wrongful conduct.”).

Plaintiffs’ unjust enrichment claim must therefore be dismissed because it merely duplicates their other claims.

### E. Negligent Misrepresentation and Breach of the Implied Warranty of Merchantability

Following Mead Johnson’s motion to dismiss, Plaintiffs decided not to pursue their claims for negligent misrepresentation and breach of the implied warranty of merchantability, as well as their claims for injunctive relief, reserving their right to seek remand of the injunctive claims in state court. Doc. 23 at 7 n.2. Accordingly, those claims are dismissed. *See Staley v. FSR International Hotel Inc.*, No. 22 Civ. 6781 (JSR), 2024 WL 1704931, at *4 (S.D.N.Y. Apr. 19, 2024).

## II. CONCLUSION

For the foregoing reasons, the motion to dismiss is GRANTED in part and DENIED in part. Plaintiffs’ claims pursuant to GBL §§ 349 and 350 and claim of fraudulent misrepresentation are not dismissed. Plaintiffs’ claims for unjust enrichment, negligent misrepresentation, and breach of the implied warranty of merchantability are dismissed. The Clerk of the Court is respectfully directed to terminate the motion, Doc. 21.

It is SO ORDERED.

Dated: August 13, 2026
New York, New York

EDGARDO RAMOS, U.S.D.J.